# EXHIBIT A

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

# EXHIBIT 93

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1    MORGAN, LEWIS & BOCKIUS LLP
     Richard W. Esterkin, SBN 70769
2    richard.esterkin@morganlewis.com
     300 S Grand Ave Fl 22
3    Los Angeles CA 90071-3132
     Tel:     (213) 612-2500
4    Fax:    (213) 612-2501

5    Attorneys for
     Amazon Logistics, Inc.

6

7

8                  **UNITED STATES BANKRUPTCY COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10                     **LOS ANGELES DIVISION**

11

| | |
|---|---|
| **In re:** | Case No. 2:19-bk-14989-WB |
| | Jointly Administered: |
| **SCOOBEEZ, et al.[1],** | 2:19-bk-14991-WB, and 2:19-bk-14997-WB |
| | |
| **Debtors and Debtors in** | Chapter 11 |
| **Possession.** | |
| | **AMAZON LOGISTICS, INC.'S** |
| | **SUPPLEMENTAL BRIEF IN SUPPORT** |
| | **OF ITS MOTION FOR AN ORDER: (A)** |
| Affects: | **DETERMINING THAT THE** |
| ■ All Debtors | **AUTOMATIC STAY DOES NOT** |
| □ Scoobeez, ONLY | **REQUIRE AMAZON TO UTILIZE** |
| □ Scoobeez Global, Inc., ONLY | **DEBTOR'S SERVICES, AND (B)** |
| □ Scoobur LLC, ONLY | **MODIFYING THE AUTOMATIC STAY;** |
| | **AND DECLARATION OF JAMES** |
| | **WILSON IN SUPPORT THEREOF** |
| | |
| | Judge: The Hon. Julia W. Brand |
| | |
| | Date: February 25, 2020 |
| | Time: 10:00 a.m. |
| | Ctrm: 1375 |

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Scoobeez (6339); Scoobeez Global, Inc. (9779); and, Scoobur, LLC (0343). The Debtors' address is 3463 Foothill Boulevard, in Glendale, California 91214.

# I.
## INTRODUCTION

Even with months of discovery, the key facts are undisputed.[2]  First, the contract under which Scoobeez performs delivery services for Amazon (the "**Agreement**") does not guarantee that Amazon will award Scoobeez any routes and provides that either Amazon or Scoobeez may terminate the contract on 30 days' notice to the other.  Scoobeez and Hillair witnesses both testified that they were aware of these provisions and the risk that they posed to Scoobeez. Despite that risk, Scoobeez chose not to diversify its client base (there is nothing in the Amazon contract that precluded it from doing so) and Hillair elected to loan Scoobeez millions of dollars.

Second, in June 2018, Amazon determined to alter its delivery service model, moving from DSP [delivery service provider] 1.0 to DSP 2.0.  The essential differences between those models included:  (a) 2.0 DSPs are generally owner operated from a single station, whereas 1.0 DSPs, such as Scoobeez, tended to be larger corporate entities operating from multiple stations; (b) the rates paid by Amazon pursuant to the 1.0 contract were individually negotiated with the DSP, whereas rates paid to 2.0s were set by region; and (c) because the 2.0 owners were generally present at the delivery station from which the DSP operated, Amazon was able to eliminate a dispatcher fee paid under the 1.0 contract.[3] ███████████████

---

[2]  The parties have exchanged thousands of pages of documents and have taken the following depositions:

Amazon witnesses:  (a) Vadim Kozin (Senior Regional Manager, On-Road Operations), (b) Micah McCabe (Senior Program Manager, Network Health), (c) David Ojeda (Senior Manager, On-Road Operations) (d) Carey Richardson (Director, Worldwide Transportation Risk and Compliance) and (e) James Wilson (Amazon 30(b)(6) witness and Senior Manager, Program Management, North America DSP).

Hillair witnesses:  (a) Scott Kaufman (Hillair partner) and (b) Sean McAvoy (Hillair 30(b)(6) witness and Hillair partner).

Scoobeez witnesses:  (a) Scott Sheikh (Scoobeez Co-Chief Executive Officer), (b) George Voskanian (Scoobeez 30(b)(6) witness and Co-Chief Executive Officer) and (c) Brian Weiss (Scoobeez Chief Restructuring Officer).

[3]  Although Scoobeez was afforded with an opportunity to transition to a 2.0 contract, it declined to do so.

*See* Excerpts from Transcript of Deposition of James Wilson at 105:2-16 (Exhibit 14 to Appendix of Exhibits in Support of Amazon Logistics, Inc.'s Supplemental Brief in Support of its Motion for an Order: (A) Determining That the Automatic Stay Does Not Require Amazon to Utilize Debtor's Services, and (B) Modifying the Automatic Stay ("Appendix of Exhibits"), hereinafter "Ex. 14, Wilson Dep. Tr.") ("A: My understanding at a high level was that an offer was given to all DSPs that you know, roughly, here's the 2.0 agreement, this is what it looks like, and we -- we'd like you to migrate. Q: Okay.  Do you know -- do you know whether or not Scoobeez responded to that communication? A: I wasn't on the team at that time. My understanding is that they

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
COSTA MESA

- 2 -

1
2
3
4
5       [4]   In fact, Amazon has determined that 2.0s, as a group, perform better than

6       1.0s across many operational measures, including customer experience, safety, driver attrition and

7       delivery quality.[5]

8              As the number of DSPs grew due to the implementation of the DSP 2.0 program and

9       Amazon's general business expansion, in April 2019, Amazon formed a North America DSP

10      Network Health Team to evaluate its then existing DSPs and, where appropriate, terminate

11      Amazon's relationship with DSPs that posed on unreasonable risk or were otherwise considered

12      poor performers.  After looking at a number of potential metrics, a decision was made to "exit"

13      DSPs that had one or both of two characteristics:  (a) over two instances of wage/hour claims

14      asserted against the DSP by employees or (b) greater than a certain number of compliance issues

15
16      did and they declined originally. Q: Who declined? A: Scoobeez. Q: So Scoobeez originally declined to take up
        Amazon Logistics on the offer to migrate to 2.0, as far as you know. A: That is my understanding.").

17      Excerpts from Transcript of Deposition of Brian Weiss at 146:23-147:5 (Exhibit 13 to Appendix of Exhibits,
        hereinafter "Ex. 13, Weiss Dep. Tr.") ("Q: Okay. All right. Are you aware of there being a concern on the part of
        Scoobeez that if Scoobeez indeed had to migrate to a 2.0 DSP business model, that it would result in a -- a loss

18      of -- it would be subject to lower rates over what Scoobeez is currently enjoying during the -- in the DS 1.0
        phase? A: Yes, from Mr. Voskanian and my discussions it would result in lower revenues.").

19      Excerpts from Transcript of Deposition of George Voskanian at 272:10-14 (Exhibit 12 to Appendix of Exhibits,
        hereinafter "Ex. 12, Voskanian Dep. Tr.") ("A: Yes.  So when they asked us to switch to 2.0, we didn't want to

20      switch to 2.0 because it was not -- first of all, we did not know the terms; and from what we understood, we had
        to give back our price increase, which would basically close our doors.").

21
        Ex. 12, Voskanian Dep. Tr. at 283:7-13 ("A: And, again, the reason 2.0 didn't make sense for us specifically is

22      because our pricing was higher than other DSPs. So it was almost guaranteed that if we were to go with the 2.0
        and there's streamline pricing that means our pricing was going to go down by about 7 to 10 percent.").

23      [4]  See Exhibit A to February 19, 2020 Declaration of James Wilson (Network Health Strategy Report) (produced as

24      AMAZON_H002559-87) (attached hereto as Exhibit A, hereinafter "Wilson Supp. Decl. Ex. A")

25
26      Ex. 14, Wilson Dep. Tr. 101:9-102:24 (explaining the difference between 1.0 and 2.0 contracts).

27      [5]  See Ex. 14, Wilson Dep. Tr. 94:18-95:2 ("Q.  And how does the 2.0 program encourage better performance?  A.
        Well, first off, its measured and – pretty much across any operational measure, the 2.0 performs better than 1.0 --  Q.

28      Okay.  A.  – for customer experience, for safety, for driver attrition, for delivery quality.  The majority of metrics are
        – are better for 2.0 than 1.0 since we've launched it.").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
COSTA MESA

1  noted in the DSP's audits.  On August 9, 2019, Scoobeez was one of 15 DSPs identified for exit

2  due to multiple wage and hour litigations.

3       It should be noted that the Network Health Review was an entirely independent process

4  from Amazon's routine monitoring of DSP compliance and performance and that neither

5  Scoobeez' prior compliance record nor its performance were factors in the decision to exit

6  Scoobeez.  The decision to exit Scoobeez due to its litigation history has proved to be prescient

7  as, at a mediation held on February 6, 2020, Amazon agreed to pay in excess of $2.1 million on

8  account of ongoing wage/hour claims for which Amazon was allegedly liable with Scoobeez as a

9  co-employer, there remains as yet unresolved wage/hour claims against Amazon based upon

10  Scoobeez' current practices ██████████████████████████████████████████

11  █████████████████████████████[6]

12       When Scoobeez attempted to assume and assign its contract with Amazon to Hillair as

13  part of its aborted asset sale, Amazon objected – the contract is not an executory contract, neither

14  Amazon nor Hillair had offered to cure Scoobeez' then existing defaults under the contract, and,

15  if for no other reason than the purchase contract provided that Hillair would assign its rights to an

16  unidentified buyer, Amazon did not receive adequate assurances of future performance.  Aside

17  from those technical reasons that precluded the contract from being assumed and assigned,

18  however:  (a) Amazon had determined to exit Scoobeez due to the fact that it posed an

19  unacceptable litigation risk, and (b) neither Scoobeez nor Hillair, as large corporate entities that

20  proposed to continue to operate Scoobeez' business from multiple delivery stations, fit Amazon's

21  DSP 2.0 model.

22

23  _____

24  [6] ████████████████████████████████████████████████████

25  █████████████████████████████████████████████████████

26  ██████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████

28  █████████████████████████████████████████████

1       The present motion for relief from the automatic stay is premised upon two simple,

2  indisputable arguments.  First, the Agreement cannot assist in Scoobeez' reorganization efforts.

3  The Agreement cannot be assumed and assigned to an asset purchaser, or assumed by Scoobeez

4  in a chapter 11 plan, because it is not an executory contract.  Further, even if the Agreement could

5  be assumed and assigned to an asset purchaser or assumed in a chapter 11 plan, the automatic stay

6  would terminate and Amazon would be free, at a minimum, to exercise its 30 day termination

7  right.  Second, so long as Amazon is forced, contrary to its contractual rights, to continue to do

8  business with Scoobeez, Amazon will be harmed in at least the following ways:  (a) Amazon will

9  suffer lost opportunity costs because it will be precluded from replacing Scoobeez with better

10  performing DSP 2.0s, and (b) Amazon will continue to be exposed to litigation risk from

11  Scoobeez' employment practices, which have continued during the pendency of this chapter 11

12  case.[7]  While Scoobeez has argued that the automatic stay should be kept in place for a limited

13  period of time so that Scoobeez can obtain clients to replace Amazon, the facts suggest that extra

14  time will not make a difference.  Scoobeez has been attempting to obtain new clients for years

15  without *any* success, this chapter 11 case is already 10 months old, and, almost five months ago,

16  on October 1, 2019, Scoobeez was informed through Amazon's objection to its attempt to assume

17  and assign the Agreement that Amazon intended to terminate the Agreement, once it was

18  permitted to do so.  The only conclusion that can be reached is that there is no reason to continue

---

[7]  Amazon recently agreed to pay $2,160,000 to satisfy three wage/hour claims.  *See* Declaration of Tuyet T. Nguyen (filed contemporaneously herewith and hereinafter referred to as "Nguyen Decl.") at Ex. 1.  Amazon has received yet another wage/hour claim that has not been resolved.  *See* Declaration of Meredith Riccio (filed contemporaneously herewith and hereinafter referred to as "Riccio Decl.") at ¶¶ 2-3. ████████████████████

████████████████████████████████████████████████████████

Ex. 8, Richardson Dep. Tr. at 210:11-19 ████████████████████████

████████████████████████████████████

Ex. 8, Richardson Dep. Tr. at 211:10-15 ████████████████████

1  to prejudice Amazon by precluding it from exercising its contractual rights.  Thus, the Court

2  should grant Amazon's motion.

3                                    **II.**
   **THE AUTOMATIC STAY DOES NOT REQUIRE**
4  **AMAZON TO UTILIZE SCOOBEEZ' SERVICES**

5         The automatic stay prevents all entities from engaging in "any act to obtain possession of

6  property of the estate or of property from the estate or to exercise control over property of the

7  estate." 11 U.S.C. § 362(a)(3).  A debtor's property rights are defined by applicable non-

8  bankruptcy law.  *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914 (1979) ("Property

9  interests are created and defined by state law.  Unless some federal interest requires a different

10 result, there is no reason why such interests should be analyzed differently simply because an

11 interested party is involved in a bankruptcy proceeding.").  The filing of a petition for relief under

12 Title 11 does not expand those rights.  *FAA v. Gull Air, Inc. (In re Gull Air, Inc.)*, 890 F.2d 1255,

13 1261 (1st Cir. 1989) ("The Bankruptcy Code does not create or enhance property rights of a

14 debtor."); *Moody v. Amoco Oil Co. (In re Moody)*, 734 F.2d 1200, 1213 (7th Cir. 1984), *cert.*

15 *denied*, 469 U.S. 982, 105 S.Ct. 386 (1984) ("The filing of the chapter 11 petition cannot expand

16 debtors' rights …."); *In re ClearPoint Business Resources, Inc.*, 442 B.R. 292, 296 (Bankr. Del.

17 2010) ("A Chapter 11 filing does not expand a debtor's rights.").

18 **A.    Scoobeez Cannot Use the Automatic Stay as a Sword to Expand its Rights Under the**
        **Agreement.**
19

20         Scoobeez' property interest in the Agreement is defined by the terms of the Agreement.

21 The plain language of the Agreement provides that Amazon has the right to terminate the

22 Agreement at any time and is not obligated to provide Scoobeez with a minimum amount of

23 business.

24                  You acknowledge and agree that Amazon makes no promises or
                   representations whatsoever as to the amount of business that you
25                 can expect at any time under these Terms . . . .

26 Amazon's Motion for Order, etc. Dkt. No. 393 at 26, ¶ 1(c).  Representatives from Scoobeez and

27 Hillair both testified that the plain language of these provisions reflects their understanding of the

28

1   Agreement.[8]  Thus, the estate does not have an interest in any particular volume of business, or

2   any business at all, under the terms of the Agreement.

3        Likewise, the covenant of good faith and fair dealing does not require Amazon to act

4   "reasonably" in awarding, or failing to award, Scoobeez business.  *Johnson v. Yousoofian*, 84

5   Wash. App. 755, 762 (1966) ("The implied duty of good faith is derivative, in that it applies to

6   the performance of specific contract obligations. If there is no contractual duty, there is nothing

7   that must be performed in good faith.") (internal citations omitted); *Hard 2 Find Accessories, Inc.*

8   *v. Amazon.com, Inc.*, 58 F. Supp. 3d 1166, 1173-74 (W.D. Wash. 2014) (finding that, under

9   Washington law, Amazon did not breach the covenant of good faith and fair dealing when it

10  terminated third party seller's selling privileges, where seller did not identify any contractual duty

11  on Amazon's part not to remove selling privileges, it was found to have violated Amazon's rules,

12  and the contract created an at-will relationship between the parties).[9]

13       Regardless of whether Amazon elects to provide Scoobeez with business, it has not

14  exercised control over a property interest of the estate, because that property interest is limited to

15  such business as Amazon elects to provide to Scoobeez.  Scoobeez' and Hillair's arguments to the

16  contrary conflict with clearly established Washington law.  Because there is no contractual duty

17  to provide business, under *Johnson*, there is no contractual duty that must be performed in good

18  faith.   Because there is no contractual duty to act in good faith when awarding routes, were

19  Amazon to cease awarding routes, it would not violate the automatic stay.

20       Scoobeez cannot contort the automatic stay to provide Scoobeez with more rights than

21  those prescribed in the Agreement.  As noted above, the law is clear – property interests are

---

22

23  [8]  *See* Ex. 13, Weiss Dep. Tr. at 61:23-62:10 ("A:--[the Amazon Agreement] states that Amazon is not required to
    provide us with a minimum volume of packages to deliver. Q: From an operational standpoint what does that mean to

24  you? A: It means that the business, you know, can go away at any time. Q: Okay. It could go up and it could go down
    in terms of volume as well; is that right? A: Um-hmm. Q: Is that a yes, sir? A: Yes, it can go up or it can go down.").

25      Excerpts from Transcript of Deposition of Sean McAvoy at 109:1-6 (Exhibit 4 to Appendix of Exhibits,
    hereinafter "Ex. 4, McAvoy Dep. Tr.") ("Q: …did you understand that Amazon did not guarantee any specific

26  number of routes per location? A: I think we understood that. So this -- we may well have understood that before
    this, but yes. Q: But Hillair understood that whether -- A: Correct.  Yes, we did understand that.").

27  [9]  *See also New Vision Programs Inc. v. State, Dept. of Social and Health Servs.*, 193 Wash. App. 1011, 2016 WL
    1230324, at *3 (Wash. Ct. App. March 29, 2016) ("[I]f a contract gives a party unconditional authority to determine a

28  term, no duty of good faith and fair dealing attaches to that term.") (unpublished).

created and defined by state law and the filing for Chapter 11 bankruptcy does not expand those

rights. *Butner, supra.; Gull Air, supra.; Moody, supra.* As a result, this Court should conclude

that Amazon is free to use, or not use, Scoobeez' services at its discretion pursuant to the

unambiguous terms of the Agreement.

### B. Amazon is not Estopped From Declining to Award Scoobeez Routes.

In its opposition to Amazon's motion, Hillair speculated that Amazon might be estopped

from declining to award Scoobeez routes.[10] Three and a half months of document production and

depositions have disclosed that Hillair's speculation is just that, speculation unsupported by an

iota of evidence.

Promissory estoppel arises where there is: "(1) A promise that (2) the promisor should

reasonably expect to cause the promise to change his position and (3) that does cause the

promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5)

injustice can be avoided only by enforcement of the promise." *Tacoma Auto Mall, Inc. v. Nissan

N. Am., Inc.*, 169 Wash. App. 111, 127 (2012).

It is undisputed that the Agreement is fully integrated and that Amazon and Scoobeez

have not entered into any additional contracts outside of the Agreement.[11] Likewise, Scoobeez

and Hillair failed to develop any evidence that, despite the terms of the Agreement, Amazon

nonetheless guaranteed routes to Scoobeez. In fact, discovery has confirmed that the opposite is

true.[12] Yet even if such conversations occurred, Scoobeez' 30(b)(6) witness, Mr. Voskanian,

---

[10] *See, e.g.*, Hillair's Opp. to Amazon's Motion for Order, Dkt. No. 418 at 30:19 ("discovery will assist in evaluating promissory estoppel").

[11] *See* Amazon's Motion for Order, Dkt. No. 393 at 36-37, ¶ 12(j) ("These Terms (together with the Program Policies, which are incorporated in these Terms by reference), any Work Orders, and any NDA constitute the complete an final agreement of the parties pertaining to the Services and supersede and replace the parties' prior agreements, understandings, representations and discussions (whether written or oral) relating to the Services.").

Ex. 12, Voskanian Dep. Tr. at 144:19-25 ("Q: So Scoobeez is not aware —A: No. Q: -- of any outside agreements – A: Correct. Q: -- outside of what is embodied in [the Amazon Agreement]? A: Yes."); 136:5-10 ("Q: Am I correct that the parties both agreed that Scoobeez would have no expectation and has not received any assurances from Amazon or any other person that your business relationship with Amazon will continue beyond the term? A: Correct.").

[12] *See* Ex. 12, Voskanian Dep. Tr. at 151:3-23 ("Q: There is an allegation in the Complaint, that you indicated you're familiar with prior to today. That Scoobeez is entitled to a minimum number of routes and that Amazon has promised certain a level of routes. Are you familiar with those allegations in the Complaint? A: Allegations by us or you guys? Q: By Scoobeez. A: Okay. I am sure in discussions, local hub leaders and Amazon employees promise you anything to keep the routes going. So there is a corporate Amazon. There is local Amazon. And the local guys are

1  testified that Scoobeez does not rely on such representations and that it has not received

2  assurances from Amazon that Scoobeez' business will continue.[13]

3         As for Hillair, it admitted that it only spoke to Amazon on one occasion prior to its

4  attempted assumption of the Agreement and that no promise or guarantee of routes was made

5  during that conversation.[14]  Hillair has referenced certain public statements Amazon made in a

6  2018 press release that Hillair has attempted to characterize as a guarantee of future business to

7  DSP operators, but this argument fails for a number of reasons.[15]  First, the relationship between

8  Scoobeez and Amazon is defined by a fully integrated contract and the amendments thereto, not

9  general statements in a press release.  Indeed, the press release does not even apply to Scoobeez

10 or other existing DSPs, like Scoobeez.  Rather, it relates to an incentive program offered by

11 Amazon to its own *employees*.[16]  Third, the press release explicitly disclaims any guarantee of

12

13 _____

under pressure to get the packages out. So whoever steps up, they will be promised routes and all of these different
14 things with the local guys. **We don't put much weight into it**. The only way we guarantee the routes that we are
going to get is by being there when they need you.") (emphasis added).

15    Ex. 12, Voskanian Dep Tr. at 147:12-148:4 ("Q: Mr. David Ojeda or any other Amazon employee never
promised you individually anything as it relates to the length of the Amazon agreement? A: No. Q: Or routes? A:
16 Correct. No. … Q: I am talking about promises that you will get X number of routes, period. A: Yeah. That's --
that was not told to us.").

17    Ex. 13, Weiss Dep. Tr. at 63:16-19 ("Q: Okay. At any point did Mr. Sheikh, Mr. Voskanian or anyone tell you
that these are promised or guaranteed routes by Amazon to Scoobeez? A: No.").

18 [13]  *See* Ex. 12, Voskanian Dep. Tr. at 151:03-23; *see also id.* at 147:12-148:4, *supra* note 12.

19 [14]  *See* Ex. 4, McAvoy Dep. Tr. at 117:19-24 ("Q: Did you understand that statement to commit Amazon to providing
Scoobeez business in all of those locations? A: To commit to do it? Q: Uh-huh. A: No.") (referencing notes from
20 Hillair's January 13, 2017 conference with David Ojeda during which he suggested a potential opportunity for
Scoobeez to expand to additional stations).

21 [15]  *See* Hillair's Opp. to Amazon's Motion for Order, Dkt. No. 418 at 30:25-27 ("Amazon has made public statements
promising DSPs like Scoobeez that if they begin and continue providing logistics services to Amazon, they can rely
22 on a constant flow of business from Amazon."); 31:9-12 ("It is also clear that Amazon fully expected DSP operators
to rely on these statements in myriad ways, including expending startup costs, entering into contracts with vendors,
23 hiring employees, and purchasing or leasing equipment – all in furtherance of their exclusive service to Amazon.").

24 [16]  *See* Hillair's Opp. to Amazon's Motion for Order, Dkt. No. 418, at 31:4-8, n.15 (citing an article from
https://www.cbsnews.com/news/pros-and-cons-of-amazon-delivery-business-offer/ that discusses an Amazon public
25 news release offering an incentive to Amazon employees to quit their current positions and start their own delivery
service companies).

26    Ex. 14, Wilson Dep. Tr. at 118:21-119:9 ("Q. Okay.  Had you – had you seen this article before.  A. I haven't
read this specific one, but I'm aware of what it's referring to.  Q.  Okay.  So why don't you tell me what its
27 referring to.  A.  We – we started a program basically – we have a number of incentives basically – Q. Sure.  A  -
- to attract talent and partners for –for our recruiting that we discussed.  And so this was referring specifically to
28 Amazon employees.  So what we refer to as blue badge employees. ---").

1    business or results.[17]   Fourth, even if Amazon's general public statements could support a

2    promissory estoppel claim, which they do not, neither Hillair nor Scoobeez has offered any

3    evidence suggesting that Scoobeez received or relied upon such statements.   Nor is there support

4    for Hillair's claim that "Amazon expected DSP operators to rely on these statements" so that they

5    will incur startup costs to the exclusive benefit of Amazon and to "prevent[] [Scoobeez] from

6    servicing any other customers."[18]   The evidence shows that Scoobeez knew that it could solicit

7    other clients and made a business decision not to diversify its business, despite having

8    opportunities to do so, because its Amazon business was more profitable.[19]   In fact, at times,

9    Scoobeez provided delivery services for customers other than Amazon – Eat24 and Hopsy – for

10   several years following the execution of its Agreement with Amazon and explored a number of

11   other potential clients.[20]   Incredibly, Hillair represents to this Court that Amazon "effectively

12   prevented [Scoobeez] from servicing any other customers" even though Hillair agreed that

---

[17]   *See* Amazon Delivery Service Partner Brochure, https://d3a8hw3k243rpe.cloudfront.net/static-assets/Download_Brochure.pdf (noting that "the startup cost, revenue, and profit figures included in this brochure are projections only and are not based on actual results of delivery companies. . . . **[Amazon] do[es] not guarantee results of any kind**, including that what a delivery company earns will exceed the owner's investment in his or her business.") (emphasis added).

[18]   Hillair's Opp. to Amazon's Motion for Order, Dkt. No. 418 at 31:13-14.

[19]   *See* Ex. 12, Voskanian Dep. Tr. at 94:17-23 ("Q: But you weren't prohibited in any way from at least exploring other relationships in 2016? A: Correct. Q: In 2017, again, no prohibition for Scoobeez at least exploring other relationships with other entities outside of Amazon; correct? A: Correct.").

   Ex. 4, McAvoy Dep. Tr at 107:9-12 ("Q. Meaning Scoobeez decided not to pursue these opportunities [to diversify its clients] because it had a better opportunity with Amazon? A. Correct.").

   Ex. 12, Voskanian Dep. Tr. at 94:25-95:14 ("Q: . . . What other entities did -- outside of Amazon, did Scoobeez do work for in 2018? A: I think Hopsy and Eat24 kind of spilled over to 2018, but we discontinued Eat24 and Hopsy because of the lack of profitability. Q: Okay. So in 2018, Scoobeez made the decision that Eat24 was not profitable and stopped doing work for Eat24; correct? A: Correct. The lack of, sort of, volume and so on and so forth. Q: All right. And then, it sounds like the same business decision on behalf of Scoobeez went into play with Hopsy in 2018, and Scoobeez stopped working with Hopsy in 2018? A: Yes.").

[20]   *See* Ex. 12, Voskanian Dep. Tr. at 93:18-22 ("Q: Did you make any attempts, to your knowledge, to do any work for other companies outside of the ones that we've mentioned in 2017? A: Of course. We were always attempting to diversify."); 89:04-90:23 (stating that Scoobeez provided delivery services to Eat 24 and Hopsy).

   Excerpts from Transcript of Deposition of Scott Sheikh at 67:18-68:23 (Exhibit 9 to the Appendix of Exhibits, hereinafter "Ex. 9, Sheikh Dep. Tr.") (stating that Scoobeez served Eat 24 and a "couple of other smaller [customers]").

1    "Scoobeez decided not to pursue these opportunities [to diversify its clients] because it had a

2    better opportunity with Amazon."[21]

3        Hillair also claims that Amazon's encouragement of DSPs to use Amazon-branded

4    equipment and uniforms amounted to promises of continued business, but these strained attempts

5    at fashioning a promissory estoppel argument were likewise exposed as meritless during

6    discovery.  The facts developed in discovery confirmed that Scoobeez' use of Amazon branded

7    equipment or uniforms was voluntary and that Scoobeez received cash payments to compensate it

8    for the cost of using branded materials when it did so. [22]

9        In order to assist DSPs with short term business planning, Amazon provides its DSPs with

10   13 week volume projections.[23]  Although Hillair and Scoobeez have claimed that these route

11   projections amounted to promises of continued business, Scoobeez' entire senior leadership

12   team—including CRO Brian Weiss and Co-CEOs George Voskanian and Scott Sheikh—testified

13   that they understood that Amazon's projections were not guarantees.[24]  Similarly, Hillair's

---

[21]  *See* Exhibit 2 to McAvoy Dep. Tr. ███████████████████████████████████████████
███████████████████████████████ (produced as HILLAIR00000237-
39) (attached hereto as Exhibit 5, to Appendix of Exhibits, hereinafter "Ex. 5, McAvoy Dep. Tr. Ex. 2")
██████████████████████

Ex. 4, McAvoy Dep. Tr. at 107:9-12 ("Q. Meaning Scoobeez decided not to pursue these opportunities [to diversify its clients] because it had a better opportunity with Amazon? 12 A. Correct.").

Ex. 13, Weiss Dep. Tr. at 57:10-16 ("Q: Is it, generally speaking, a good idea if you're able to diversify your revenue streams rather then have them concentrated? A: Yes. Q: Okay. It's riskier to keep them concentrated; right? A: Yes.").

Ex. 9, Sheikh Dep. Tr. at 137:2-10 ("A: . . . just from a business standpoint, I mean, revenue diversification makes sense. I mean, I -- I wouldn't put it past them to try it. Q: It makes sense; right? A Sure. Q: It doesn't make sense to have all your eggs in one basket; does it? A: No.").

[22]  *See* Ex. 14, Wilson Dep. Tr. at 53:14-19 ("Q: Are DSPs required to wear certain uniforms? A: They're not required to do that. Q: Okay. Are DSPs required to use preferred vendors that Amazon Logistics suggests? A: No, they're not required.").

Ex. 12, Voskanian Dep. Tr. at 116:01-15 (testifying in his corporate capacity that Scoobeez was afforded the opportunity to negotiate its contract with Amazon and, in fact, did so).

Amazon's Motion for Order, Dkt. No. 393 at 168, ¶ 4 (outlining terms Scoobeez agreed to by "[i]n consideration of accepting the Uniform and Vehicle Brand Promotion Fee"); 164-167 (indicating amount of Uniform and Vehicle Brand Promotion Fee per Planned Route offered by Amazon at each location).

[23]  *See* Ex. 14, Wilson Dep. Tr. at 164:21-23 ("A: …We'll give like a 13-week forecast once a month to all of our DSPs, and that's just guidance basically.").

[24]  *See* Ex. 13, Weiss Dep. Tr. at 63:2-19 ("Q: Okay. Did you, Mr. Weiss, have a sense of whether those were promised routes from Amazon to Scoobeez, or whether they were just projections about future work that may be done? A: They are projections. Q: Okay. Did Mr. Voskanian tell you that they are projections? A: Yes. Q: Okay. Did

corporate representative also testified that that Amazon did not provide a route guarantee.[25] *See also* Amazon's Motion for Order, Dkt. No. 393 at 26, ¶ 1(c) ("Amazon may from time to time give volume, . . . product distribution or other projections to you, but such projections are speculative only and will not in any event give rise to liability on the part of Amazon,").[26]

In sum, all parties understood that the terms of the Agreement controlled and that Scoobeez ran the risk that Amazon would curtail, or eliminate altogether, the number of routes awarded to Scoobeez.  There is simply no evidence that would support the creation of an estoppel to prevent Amazon from enforcing the Agreement as written.

### III.
### AMAZON IS ENTITLED TO RELIEF FROM THE STAY TO TERMINATE THE AGREEMENT AND/OR TO CEASE AWARDING SCOOBEEZ ROUTES

Bankruptcy Code section 362(d)(1) provides that "the court **shall** grant relief from the stay provided under subsection (a) of this section …(1) for cause, including the lack of adequate protection of an interest in property of such party in interest." (emphasis added). "'Cause' is not defined in that statute, giving bankruptcy courts the flexibility to define cause in a particular case." *In re Mantachie Apartment Homes, LLC*, 488 B.R. 325, 331 (Bankr. N.D. Miss. 2013) (referring to 11 U.S.C. § 362(d)(1)). When determining whether "cause" exists for modifying the

---

anybody else outside of Mr. Voskanian tell you that they were projections? A: Mr. Sheikh. Q: Okay. Anybody else outside those two gentlemen you just mentioned? A: No. Q: Okay. At any point did Mr. Sheikh, Mr. Voskanian or anyone tell you that these are promised or guaranteed routes by Amazon to Scoobeez? A: No.").

Ex. 9, Sheikh Dep. Tr. at 184:10-25 ("Q: The contract itself -- itself specifically describes projections, and I'm talking about Paragraph 1C, and says that 'Such protect -- projections are speculative only and will not in any event give rise to any liability on the part of Amazon.' So Amazon is telling Scoobeez, these are just projections; correct? A Based on the plain language of what you've said – Q: Yes. A: -- that's what this document reads, yes. Q: And you understood that the projections, as you told us moments ago, could go up, could go down, based on a number of factors? A: They tend to go up, not down, but yes, that's correct.").

Ex. 12, Voskanian Dep. Tr. at 125:10-14 ("Q: …Did Scoobeez, in fact, have an understanding that any projections Amazon would give Scoobeez were completely speculative? A: Yes -- well, correct. So they -- that is what the contract says, yes."); 128:14-18 ("Q: … [Am] I correct Mr. Voskanian that Amazon did not make any promises to Scoobeez as part of the contract that there would be a minimum -- minimum volume and exclusivity; correct? A: Correct.").

[25]  *See* Ex. 4, McAvoy Dep. Tr. at 108:25-109:6 ("Q.  And given the response that Imran provided here to this question, did you understand that Amazon did not guarantee any specific number of routes per location?  A.  I think we understood that.  So this – we may well have understood that before this, but yes.").

[26]  Amazon's Motion for Order, Dkt. No. 393 at 26, ¶ 1(c).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
COSTA MESA

1    automatic stay, courts "may consider the consequences of the stay on the parties and the 'balance

2    of hurt' in tailoring relief appropriate for the factual scenario." *In re Tudor Motor Lodge*

3    *Associates, Ltd. Partnership*, 102 B.R. 936, 954 (Bankr. N.J. 1989).

4         As a result of Scoobeez' contention that the automatic stay prevented Amazon from

5    exercising its contractual rights, Amazon has been forced to do business with Scoobeez, which is

6    at best an average performing DSP, rather than allocating the routes awarded to Scoobeez to its

7    better performing DSP 2.0s.[27] Amazon has also been forced to continue to incur the wage/hour

8    litigation risk that recently caused it to agree to pay $2,160,000.[28] The Agreement's provisions

9    permitting Amazon to cease providing routes and to terminate the Agreement at its discretion

10    ought to have protected Amazon from those exposures, but has not done so due to the

11    intervention of Scoobeez' bankruptcy case and the triggering of the automatic stay. Because

12    Scoobeez cannot adequately protect Amazon from the suspension of its contractual rights,

13    Amazon is entitled to relief from the automatic stay.

14    **A.**    **Amazon's Property Interest in Terminating the Agreement Pursuant to its Terms**
15           **Constitutes Cause for Modifying the Automatic Stay.**

16         Numerous courts have held that, when a party has an unqualified right to terminate a

17    contract, relief from the automatic stay is appropriate to allow that party to exercise that right.[29]

---

[27] *See* November 11, 2019 Declaration of James Wilson, Dkt. No. 430 at 16-17, ¶ 7 (stating that Scoobeez performance percentile as compared to that of the other DSPs at the delivery stations from which Scoobeez operates from Week 27 of 2019 through November 1, 2019 was 49.58%).

    Ex. 14, Wilson Dep. Tr. at 94:21-95:2 ("A: . . . pretty much across any operational measure, the 2.0 performs better than 1.0 --Q: Okay. A: -- for customer experience, for safety, for driver attrition, for delivery quality. The majority of metrics are -- are better for 2.0 than 1.0 since we've launched it.").

[28] *See* Nguyen Decl. at Ex. 1.

[29] *See e.g.*, *Matter of West Electronics Inc.*, 852 F.2d 79 (3d Cir. 1988) (granting relief to stay based where debtor in possession did not have a legally cognizable interest in the contract); *Bonneville Power Administration v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238 (5th Cir. 2006) (relief from stay appropriate if exception to enforcement of ipso facto clause provided for in § 365(e)(2) applies); *In re Adana Mortgage Bankers, Inc.*, 12 B.R. 977 (Bankr. N.D. Ga. 1980) (relief from stay granted to terminate contract that was not assumable); *In re National Environmental Waste Corp.*, 191 B.R. 832, 838 (Bankr. C.D. Cal. 1996) (annulling stay retroactively to ratify discretionary termination of waste hauling contract by City, because "had the City applied to the Court for relief from the automatic stay to terminate the Newco contract, the Court would have routinely granted the motion."); *In re Deppe*, 110 B.R. 898, 907 (Bankr. Minn. 1990) (granting relief from the stay to permit termination of rejected contract, stating: "11 U.S.C. § 362(a)(3) maintains a tenuous veil of protection over the estate's rights, such as they are. Nothing would be gained for creditors of the estate by preserving that veil. [The non-debtor] is entitled to the relief which it requests.").

1    Here, Amazon has such a right.[30]  In conflict with the aforementioned weight of authority, Hillair

2    and Scoobeez rely upon *In re Nat'l Hydro-Vac Indus. Serv., L.L.C.*, 262 B.R. 781, 787 (Bankr.

3    E.D. Ark. 2001).[31]  As set forth more fully in Amazon's Reply Memorandum in Support of its

4    Motion for Order, *National Hydro-Vac* does not stand for the proposition that the presence of an

5    at-will termination provision cannot provide cause for relief from the stay.[32]  Rather, it holds that

6    an at-will termination clause cannot be exercised when the reason for doing so is that the debtor

7    filed a bankruptcy petition.[33]  Three months of exhaustive discovery clearly shows that Amazon's

8    August 9, 2019 decision to terminate its Agreement with Scoobeez was based on Scoobeez

9    meeting Amazon's litigation waterfall under Amazon's DSP exit framework, not Scoobeez'

10    bankruptcy petition.[34]

11         Amazon's decision to terminate the Agreement was the product of a measured, deliberate,

12    and systematic process aimed at identifying and removing poor DSP partners from Amazon's

13    DSP network.  In April 2019, as the number of DSPs increased, Amazon created a North America

14    DSP Network Health Team to monitor and evaluate its DSP partners and ensure that Amazon

15    "was doing business with the right people." [35]  Shortly after its creation, the Network Health

16

17

18    [30] *See* Amazon's Motion for Order, Dkt. No. 393 at 31, ¶ 8(a) ("Either party may terminate these Terms at any time, with or without cause, by providing the other party with 30 days' prior written notice.").

19    [31] *See* Hillair's Opp. to Motion for Order, Dkt. No. 418 at 20; Scoobeez' Opp. to Motion for Order, Dkt. No. 419 at 16.

20    [32] *See* Amazon's Reply in Support of Motion for Order, Dkt. No. 430 at 10.

21    [33] *National Hydro-Vac*, 262 B.R. at 787.

22    [34] *See* Excerpts from Transcript of Deposition of Micah McCabe at 49:14-17 (attached hereto as Exhibit 7 to the Appendix of Exhibits, hereinafter "Ex. 7, McCabe Dep. Tr.") ("Q: And was it the mere number of lawsuits that led to

23    that determination [to terminate Scoobeez as a DSP]? A: Yes. The analysis was to look at the number of litigation cases that DSP had.").

24    Ex. 14, Wilson Dep. Tr. at 145:17-146:1 ("Q: Okay. A: And on August 9th, the decision was made to terminate all 15 of those DSPs, one of which Scoobeez -- Scoobeez was in that list because they had been involved in

25    multiple litigations. Q: Okay. And at that time, that was the only factor, the multiple litigation factor. A: That was -- that was -- in this specific analysis at that specific time, that was the -- the -- the reason that we identified

26    those 15 DSPs.").

27    [35] Ex. 14, Wilson Dep. Tr. at 136:15-23 ("Q. Okay.  So can you tell me a little bit how the network health team was created?  A.  Basically, there was no mechanism to really evaluate the partners that we did business with.  And so one

28    of things, you know, that I was tasked with was to build a network health team to basically create mechanisms and processes to review that.  And I was given a headcount in April 2019 to do that.").

1    Team, led by Micah McCabe reporting to James Wilson, developed a framework to identify and

2    eliminate undesirable DSPs.[36]   The framework, which originally focused on eliminating 1.0

3    DSPs (in favor of the preferred 2.0 DSPs) and poor-performing DSPs, was presented to senior

4    Amazon leadership on July 1, 2019, but was immediately rejected.[37]   In its place, Amazon

5    leadership suggested that the Network Health Team create a framework to identify and eliminate

6    DSPs with a certain number of compliance issues and wage-and-hour litigation.[38]   On August 6,

7    2019, Amazon senior leadership reviewed the new proposal and directed the Network Health

8    team to focus immediately on exiting the 15 DSPs identified in the first bucket, "Litigation,"

9    while taking time to refine the "Compliance" category before exiting the DSPs included on the

10    list solely as a result of compliance issues.[39]   Under this framework, any DSP with two or more

11    wage and hour litigations would be exited.[40]   On August 9, 2019, Mr. Wilson confirmed that it

---

Ex. 14, Wilson Dep. Tr. at 40:13-17 ("Q. Okay. And then the network health team, what do they do? A. They evaluate the – the -- the relationships we have with DSPs to determine if we're doing business with the right people.").

[36]   *See* Ex. 14, Wilson Dep. Tr. at 143:25-144:16 ("Q. Okay. That was under your direction when the network health team – soon after the network health team was first formed? A. Yes. Q. Okay. A. My – my team authorized *(sic)* a recommendation -- Q. Okay. A. – basically. And so that – that recommendation basically really focused on two things. First, it focused on eliminating the 1.0 contract. The second thing was performance, consistent performance violations. We talked about – before about, you know the 2.0 agreement consistent performance violations. Those were the two things that we focused on. We gave that recommendation up to leadership.").

[37]   *See* Wilson Supp. Decl. Ex. A (Network Health Strategy Report)

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

Exhibit B to February 19, 2020 Declaration of James Wilson (June 10, 2019-August 9, 2019 Email Chain between multiple Amazon employees) (produced as AMAZON_E000715-730) (attached hereto as Exhibit B, hereinafter "Wilson Supp. Decl. Ex. B") (memorializing July 1, 2019 meeting, during which the Network Health Strategy report was discussed).

Ex. 14, Wilson Dep. Tr. at 144:17-145:4 ("Q. So that – there were two, essentially, filters for the – for the chart or spreadsheet. It was going to be performance and ultimate elimination of the 1.0 contract? A. Correct. Those were – that was the recommendation that my team made. Q. Okay. A. That recommendation was rejected. A. Q. Okay. A. And – and ---. Q. Rejected by? A. A - a panel of leaders across multiple teams.").

[38]   *See* Wilson Supp. Decl. Ex. B (July 29, 2019 email noting new exit framework based on litigation and compliance waterfall metrics and slating Scoobeez for exit based on meeting the litigation waterfall metric).

[39]   *See* Wilson Supp. Decl. Ex. B.

[40]   *See* Ex. 14, Wilson Dep. Tr. at 259:5-19 (Q. Okay. So we talked about the fact that Scoobeez, because of the multiple wage an *(sic)* hour litigations that Scoobeez is involved in is why they're slotted for termination; is that right? A. Yes. …. Q. And I think that you testified earlier that it's the fact it's wage an *(sic)* hour litigation as opposed to other kinds of litigation that is the – the factor. …. A. The – input we used was – was the number of wage an *(sic)* hour litigations when we made the decision on August 9th.").

1    would immediately begin exit preparations for the 15 DSPs identified in the "Litigation" bucket,

2    including Scoobeez.[41]  To date, this initial wave of DSP terminations, which encompassed both

3    1.0 and 2.0 DSPs, is nearly fully complete, with all of the exits having been completed or in

4    process.[42]

5           Far from arbitrary, Amazon's focus on litigation was rooted in its recognition that DSP

6    wage-and-hour litigations create significant risk for Amazon, including:

7    • the cost of defending and settling the litigation,

8    • time and attention directed away from Amazon's business when its employees are

9        required to participate in the litigation,

10   • potential exposure of Amazon's confidential information/trade secrets during

11       discovery or at trial,

12   • bad publicity that accompanies litigation involving allegations that drivers utilized

13       to deliver Amazon packages are not being paid in accordance with applicable law,

14   • network-wide implications of potential negative legal rulings in the litigation, and

15   • potential risks to network capacity resulting from the litigation's economic impact

16       upon DSP defendants.[43]

17

---

18   [41]  *See* Ex. 14, Wilson Dep. Tr. at 145:5-146:1 ("Q. Okay. A: . . . the feedback was, hey, go back and -- and evaluate
the network again with a lens of let's identify DSPs that have been involved in multiple litigations and let's focus on

19   them first. We did that, and we came out with 15 DSPs. Q: Okay. A: And on August 9th, the decision was made to
terminate all 15 of those DSPs, one of which Scoobeez -- Scoobeez was in that list because they had been involved in

20   multiple litigations. Q: Okay. And at that time, that was the only factor, the multiple litigation factor. A: That was --
that was -- in this specific analysis at that specific time, that was the -- the -- the reason that we identified those 15

21   DSPs.").

    Wilson Supp. Decl. Ex. B (August 9, 2019 email adopting a slightly revised version of the litigation waterfall

22   metric established in the July 29, 2019 email).

23   [42]  *See* Ex. 14, Wilson Dep. Tr. at 146:2-9 ("Q: Okay. And other than Scoobeez, have all 15 of those DSPs -- or 14
been eliminated from the program? A: They -- Q: Or terminated? A: The vast majority of them have been terminated.

24   We are in process of finishing that list.").

    Ex. 14, Wilson Dep. Tr. at 226:11-14 ("Q: Okay. Have all the 1.0s on that list been terminated other than

25   Scoobeez? A: They have been communicated - the decision to communicate - to terminate them.").

26   [43]  *See* Ex. 14, Wilson Dep. Tr. 262:9-21 ("A:  . . . the fact there are multiple litigations filed is -- is a trend and sign
that there is something structurally wrong in that DSP. You know, when we have multiple litigations, it's expensive

27   to us, distracts us from focusing on what we want to focus on, that's delivering smiles with our packages. It -- it's bad
publicity, and it -- you know, anytime we get in litigation, it forces us to have to go through discovery process, which

28   Amazon's a very secretive company. And we're constantly changing and evolving, and that -- that's a risk of having
to give up trade secrets that we just don't really want to do.").

1   Amazon's assessment of litigation as a primary risk to its network ultimately proved prescient,

2   particularly with respect to Scoobeez.  As highlighted above, Amazon recently agreed to pay $2.1

3   million to settle the *Key/Vega* case, which is a wage-and-hour case brought by Scoobeez'

4   employees against Amazon.[44]  Clearly, Amazon's decision to terminate the Agreement was based

5   on a well-reasoned rationale that was developed separate and apart from Scoobeez' bankruptcy

6   and pre-petition defaults and that was applied to multiple DSPs without discrimination.  As a

7   consequence, cases such as *National Hydro-Vac* that refuse to permit non-debtor parties to

8   exercise discretionary termination rights when those rights are being exercised in violation of

9   public policy have no application to this case.

10       In sum, Amazon's absolute right to terminate a contract that cannot generate substantial

11  proceeds if transferred to a third party, and cannot be the foundation of a confirmable plan of

12  reorganization, constitutes "cause" to modify the stay.

13  **B.    Scoobeez Cannot Adequately Protect Amazon's Property Right Under the
           Agreement.**

14

15       Scoobeez and Hillair contend that Scoobeez' continued performance under the Agreement

16  is somehow sufficient to protect Amazon's interests.[45]  This contention misses the rights at issue

17  – Amazon's right to terminate the Agreement pursuant to its terms, protect itself from the risk

18  associated with working with a business that has caused it to expend millions of dollars in

19  litigation brought by that company's employees and to conduct business with other entities under

20

21  _____

22      Ex. 7, McCabe Dep. Tr. at 202:5-22 ("Q: And the consequences that you mentioned of the uncertainty and all
        that, if Amazon agreed not to terminate Scoobeez, those concerns would go away; is that correct? A: No, I

23      disagree.  We would still be in partner with a DSP that has a history of litigation. Litigation, when Amazon is
        brought into it, costs money.  It costs time for attention for employees to address it, and then there is also a PR

24      risk associated with the litigation related to DSPs. Q: What PR risk is that? A: I would point to a Buzz Feed
        article that came out several months ago associated with DSPs that have poor DA practice -- pay practices, and

25      there was accidents that were resulting from their -- those drivers.  Those are DSPs that we may or may not
        choose to be in relationship with because of how they're -- because of their litigation history.").

26  [44]  *See* Nguyen Decl. at Ex. 1.

27  [45]  Scoobeez' Opp. to Motion for Order, Dkt. No. 419 at 16 ("Amazon's rights under the Amazon Contracts are
        clearly protected by the Debtors continued performance thereunder."); Hillair's Opp. to Motion for Order, Docket

28      No. 418 at 20 ("Scoobeez has performed all of its obligations under the Amazon Agreement during the post-petition
        period.").

1    more favorable terms and who present less liability risk to Amazon.  Scoobeez' ability to perform

2    delivery routes has no relevance.

3        The harm posed to Amazon is not hypothetical or speculative.  Amazon was forced to pay

4    $2.1 million to settle wage and hour claims brought by Scoobeez employees against Scoobeez

5    and Amazon—including claims up to and through February 2020—less than two weeks ago.[46]

6    There are other, unresolved claims ███████████████████████████████████

7    ████████████████████████[47]  Furthermore, the automatic stay prevents Amazon from

8    partnering with preferred 2.0 DSPs, which generally perform better across all metrics than 1.0

9    DSPs (such as Scoobeez), provide better economic terms, and pose lower litigation and systemic

10   capacity risks than Scoobeez.[48]

11       Even if Scoobeez' delivery performance was relevant to assess the adequacy of the

12   protection afforded to Amazon's contract rights, Scoobeez' performance falls short.  Contrary to

13   the selective scorecards upon which Scoobeez and Hillair rely, overall, Scoobeez has been a

14   slightly less than average performer.[49]  Although its mean score was "Great," great is the median

---

[46]  *See* Nguyen Decl. at Ex. 1.

[47]  *See* Riccio Decl. at ¶¶ 2-3; *see also* Ex. 8, Richardson Dep. Tr. at 208:15-211:15, *supra* note 7.

[48]  *See* Ex. 14, Wilson Dep. Tr. at 222:6-13 ("A: Another example of an opportunity costs would be, you know, we from a capacity, planned to -- to -- you know, to not have them in our network.  And so we planned and recruited to have other DSPs in the stations, that because Scoobeez is still there, we're hindering their ability to grow and scale their businesses. So that could be another opportunity cost."); 94:21-95:2 ("A: . . . pretty much across any operational measure, the 2.0 performs better than 1.0 --Q: Okay. A: -- for customer experience, for safety, for driver attrition, for delivery quality. The majority of metrics are -- are better for 2.0 than 1.0 since we've launched it.").

   Ex. 14, Wilson Dep. Tr. at 221:14-222:21 (stating that one of the harms posed by the stay is continued business with a DSP who has had multiple litigations when those routes could be given to a DSP that does not have ongoing litigations).

   Ex. 7, McCabe Dep. Tr. at 108:12-16 ("A: A DSP who may operate in 20 stations, have owned -- and their routes account, for example -- it's an egregious number, but 20 percent of all routes, whether that is a risk to our network, given that relationship and the dependency on them.").

[49]  *See* November 11, 2019 Declaration of James Wilson, Dkt. No. 430 at 16-17, ¶ 7 (stating that Scoobeez performance percentile as compared to that of the other DSPs at the delivery stations from which Scoobeez operates from Week 27 of 2019 through November 1, 2019 was 49.58%).

score under the Amazon grading spectrum.[50] More importantly, Scoobeez' ongoing lack of

compliance with employment laws poses a continuing and ever increasing litigation risk.[51]

Further, the continuance of Scoobeez' management, Co-CEO and General Counsel Scott

Sheikh and Co-CEO and CFO George Voskanian, as proposed by Hillair, undermines the

protection of Amazon's property interests.[52] For example, Hillair, Scoobeez' ally in opposing the

relief sought by Amazon and the current champion of Messrs Sheik and Voskanian, has stated in

a sworn declaration that, during Messrs Sheikh and Voskanian's tenure as counsel and CFO,

respectively, Scoobeez made materially false statements in its Annual Report filed with SEC and

failed to meet other disclosure obligations.[53]

---

[50] *See* Ex. 12, Voskanian Dep. Tr. at 253:25-254:06 (stating that Amazon's rating scale is a five point scale starting with "poor" on the low end, "fair," then "great," then "fantastic"; and then "fantastic-plus" on the high end).

[51] *See* Ex. 14, Wilson Dep. Tr. at 262:2-23 ("Q: Well, as of August 9th when they got on the list because of multiple litigations, I'm trying to understand, is it just the fact they were filed? A. Yes. When the recommendation was – was aligned on August 9th, it was just the fact that there were multiple litigations. I mean, multiple -- the fact there are multiple litigations filed is -- is a trend and sign that there is something structurally wrong in that DSP. You know, when we have multiple litigations, it's expensive to us, distracts us from focusing on what we want to focus on, that's delivering smiles with our packages. It -- it's bad publicity, and it -- you know, anytime we get in litigation, it forces us to have to go through discovery process, which Amazon's a very secretive company. And we're constantly changing and evolving, and that -- that's a risk of having to give up trade secrets that we just don't really want to do. So the fact that, you know, they were filed forces us to go through all those things.").

Ex. 7, McCabe Dep. Tr. at 202:5-22 ("Q: And the consequences that you mentioned of the uncertainty and all that, if Amazon agreed not to terminate Scoobeez, those concerns would go away; is that correct? A: No, I disagree. We would still be in partner with a DSP that has a history of litigation. Litigation, when Amazon is brought into it, costs money. It costs time for attention for employees to address it, and then there is also a PR risk associated with the litigation related to DSPs. Q: What PR risk is that? A: I would point to a Buzz Feed article that came out several months ago associated with DSPs that have poor DA practice -- pay practices, and there was accidents that were resulting from their -- those drivers. Those are DSPs that we may or may not choose to be in relationship with because of how they're -- because of their litigation history.").

[52] *See* Ex. 9, Sheikh Dep. Tr. at 58:18-59:4 (testifying that he served as outside counsel starting in July 2016 and that his role morphed into a general counsel role by July 2017); 17:7-11 (testifying that he added the title of Co-CEO on May 10, 2019).

Ex. 12, Voskanian Dep. Tr. at 32:13-20 (testifying that he has served as Scoobeez' CFO since July 2017 and added the titled of co-CEO on May 1, 2019).

Exhibit 16 to Transcript of Deposition of Scott Kaufman ████████████████████████ (produced as HILLAIR000000136-42) (Exhibit 2 to Appendix of Exhibits, hereinafter "Ex. 2, Kaufman Dep. Tr. Ex. 16) (stating that the ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████

[53] Declaration Of Scott D. Kaufman In Support Of Hillair Capital Management, LLC's Notice Of Motion And Omnibus Motion For Entry Of Order Authorizing Examinations Pursuant To Federal Rule Of Bankruptcy Procedure 2004, Dkt. No. 37. After quoting a statement from the SEC filing, Mr. Kaufman states: "However, this statement is

1       Equally concerning is Hillair's, and Messrs Sheikh and Voskanian's, failure to address

2   Mr. Ohanessian's alleged misappropriation of Scoobeez assets. ████████████████████

3   ████████████████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████[54]  Mr.

5   Sheikh and Mr. Voskanian did nothing when they learned of these allegations.  Among other

6   consequences, Mr. Ohanessian remained in control and was able to continue to drain Scoobeez of

7   cash, including "factoring" $3,704,553 of Scoobeez' accounts receivable (which had previously

8   been pledged to Hillair) at an effective interest rate in excess of 1000% per annum.[55]

9



10   false.  This statement in a public securities filing is astonishing and false." at ¶ 17.  After noting that Hillair had sent
letters to Scoobeez declaring Scoobeez to be in default of its loan agreements with Hillair, Mr. Kaufman further

11   declared that:  "Under the Pink Sheet Guidelines, the Default Letter constituted a material corporate event requiring a
public disclosure filing.  This disclosure was required by March 25, 2019 at the latest.  Hillair has searched the public

12   records and found no such disclosure."  At ¶ 20.  Mr. Kaufman also declared that "Similarly, the filing of a
bankruptcy petition is a material event which requires public company disclosure.  The Debtors did not timely make

13   the required public disclosures of their bankruptcy filing."  At. ¶ 21.

14   [54]  *See* Exhibit 15 to Sheikh Dep. Tr. (produced as HILLAIR0000024-25) (Exhibit 10 to Appendix of Exhibits,
hereinafter "Ex. 10, Sheikh Dep. Tr. Ex. 15) ██████████████████████████████████████

15   ███████████████████  Exhibit 16 to Sheikh Dep. Tr. (produced as HILLAIR00000584-88) (attached hereto as
Exhibit 11 to Appendix of Exhibits, hereinafter "Ex. 11, Sheikh Dep. Tr. Ex. 16")

16

17

18

19   Ex. 9, Sheikh Dep. Tr. at 294:16-295:21; 310:8-22 (testifying that he learned about the Imran Firoz March 2017
Whistleblower in 2017 in his capacity as counsel for Scoobeez and was **not aware of any investigation into the**

20   **allegations involving the Whistleblower report**) (emphasis added).

21   Ex. 12, Voskanian Dep. Tr. at 351:1-22 (testifying that he learned about the Imran Firoz March 2017
Whistleblower in 2017 approximately  in six months to a year after he joined Scoobeez as the CFO in July 2017

22   and stating "**what happened in the past is – you know, you can't do anything about it.**") (emphasis added).

23   [55]  *See* Ex. 12, Voskanian Dep. Tr. at 355:5-22; 358:14-361:25 (testifying that the CEO took out high interest loans
without the CFO knowing because he was able to set up a bank account and move Scoobeez' funds into it).

24   *See also* Exhibit F to February 19, 2020 Declaration of James Wilson (HOP Capital Secured Merchant
Agreement dated September 13, 2018 factoring $877,500 of receivables for a payment of $650,000) (attached

25   hereto as Exhibit F, hereinafter "Wilson Supp. Decl. Ex. F"); Exhibit E to February 19, 2020 Declaration of
James Wilson (GTR Source LLC Merchant Agreement dated December 3, 2018 factoring $1,823,750 of

26   receivables for a payment of $1,250,000) (attached hereto as Exhibit E, hereinafter "Wilson Supp. Decl. Ex. E");
Exhibit C to February 19, 2020 Declaration of James Wilson (Palm Funding, LLC Merchant Agreement dated

27   December 3, 2018 factoring $583,600 in receivables for a payment of $400,000) (attached hereto as Exhibit C,
hereinafter "Wilson Supp. Decl. Ex. C"); and Exhibit D to February 19, 2020 Declaration of James Wilson

28   (Chrome Cap $ Agreement for the Purchase and Sale of Future Receipts factoring $419,700 of receivables for a
payment of $300,000) (attached hereto as Exhibit D, hereinafter "Wilson Supp. Decl. Ex. D").

1  ██████████████████████████████████████████████████████████

2  ██████████████████████████████████████████████████

3  ████████████████████████████████[56]  Instead of investigating these

4  transactions and requiring the implementation of internal financial controls as recommended by

5  its consultant, Hillair ignored these red flags and handed Mr. Ohanessian the millions of dollars

6  that it now seeks to recover by depriving Amazon of its contractual rights.

7       In sum, the continuation of the automatic stay deprives Amazon of its bargained for right

8  to do business with a DSP of its choice.  The litigation risk that caused Amazon to determine to

9  discontinue its relationship with Scoobeez persists to this day.  That Scoobeez is a slightly below

10  average DSP, or that current management will continue in their present roles, does not adequately

11  protect Amazon's contractual rights.  As a result, Amazon's motion to modify the stay should be

12  granted.

13  **C.**    **The Unclean Hands Doctrine Does Not Prevent this Court from Granting Amazon Relief from the Stay.**

14

15       Amazon's decision to terminate the Agreement was not borne of a bad faith effort to put

16  Scoobeez out of business or poach its employees as Scoobeez and Hillair suggest.[57]  As discussed

17  in detail above, Amazon's decision to terminate its relationship with Scoobeez was based upon

18  Scoobeez' litigation history, not the fact that Scoobeez was a chapter 11 debtor or any animus

19

20  [56]  *See* Exhibit 3 to McAvoy Dep. Tr. █████████████

21  ████████████████ (produced as HILLAIR00001897-1900) (Exhibit 6 to Appendix of Exhibits, hereinafter "Ex. 6, McAvoy Dep. Tr. Ex. 3")

22  ████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████

25  [57]  *See* Scoobeez' Opp. to Amazon's Motion for Order, Dkt. No. 419 at 12:27-13:2 ("Amazon has made it clear that it

26  wants to 'transition' the Debtors' employees to other DSP providers utilized [by] Amazon, which is further indicative of its scheme to advance its own economic interest at the expense of the proverbial little guy – in this case, the Debtors.").

27      Hillair's Opp. to Motion for Order, Dkt. No. 418 at 33:5-6 ("Amazon's conduct evidence its singular desire to

28  put the Debtors out of business, and then have the Debtors' employees siphoned to other DSPs that Amazon favors.").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
COSTA MESA

1   towards Scoobeez.  Notably, the same litigation based metric that caused Scoobeez to be

2   identified for exit was applied, without discrimination, to more than a dozen other DSPs.

3          Scoobeez representatives admitted at their depositions that Amazon has not attempted to

4   poach Scoobeez' employees.[58]  In fact, Amazon made it clear that any discussion with Scoobeez

5   employees in which Amazon was to have participated would have occurred only with Scoobeez'

6   consent and in coordination with Scoobeez.[59]

7

8

---

9   [58]  *See* Ex. 9, Sheikh Dep. Tr. at 228:18-21 ("Q: So Amazon didn't go behind your back and solicit drivers directly,
    to your knowledge to offer that kind of assistance; right? A: To my personal knowledge, no.").

10     Ex. 12, Voskanian Dep. Tr. at 252:19-25 ("Q: All right. Do you have any evidence, as you sit here today, that
    Amazon, in fact, did poach any drivers? A: On behalf of themselves or for other DSPs? Q: In any way. A: Well,
11     I was on -- other than flex, they don't have drivers. No, I don't.").

12  [59]  *See* Adv. Case No. 19-01456, Dkt. No. 2 at 46 ("Assuming that you accept the $1,100,000 offer and sign the
    separation agreement, we would like to propose the following steps: … October 25th:  In partnership with Amazon,
13     each appointed Scoobeez/Hillair manager delivers the message to drivers that the agreement has been terminated
    effective January 6, 2020.").

14     Amazon's Motion for Order, Dkt. No. 393 at 32, ¶ 8(c) ("In connection with the termination or expiration of
    these Terms or any Work Order for any reason, you will provide reasonable assistance to Amazon in order to
15     enable and facilitate an orderly transition of the Services to Amazon or a third party designated by Amazon.").

16     Ex. 7, McCabe Dep. Tr. at 166:15-168:9 ("Q: And it references the process of Amazon partnering with a DSP
    owner to notify the DAs. What did you mean by that? A: When -- as part of an exit the driver or the owner will
17     need to notify their drivers that the relationship between Amazon and the DSP has been terminated. […] As a
    result of an exit, these drivers most likely will be terminated from their position. We -- the process of an exit, we
18     help facilitate introductions to other DSPs that may be hiring if those DAs need to find work. So as part of a DA
    notification, we ask the owner that we be part of it so that we can help communicate to the drivers that if they are
19     going to be terminated and would like to continue operating as a driver with another DSP, we can help facilitate
    introductions; but we do that in partnership with the DSP owner that is being exited. Q: And how did you
20     determine which DSPs would -- would you send -- would you recommend that the drivers be sent? A: We do not
    give preferential treatment to any individual DSP at the station. We just try to facilitate times that owners are
21     available in the station where the drivers can show up and speak to the other owners.  The drivers are not
    Amazon employees. So I can't assign them to a new DSP. Q: Would you facilitate introductions for all the DSPs
22     in a particular station? A:  The process that we had laid out is to open it up to all DSPs who were at the station.
    However, execution at the station, I'm not there when it happens. Q: And why does Amazon facilitate
23     introductions? […] A: The downside or -- there is a very negative impact on drivers as a result of an exit, people
    who are becoming unemployed for nothing that they did. So the attempt is to mitigate the harm done to those
24     employees.").

25     Excerpts from Transcript of Deposition of Vadim Kozin at 229:7-24 (Exhibit 3 to Appendix of Exhibits,
    hereinafter "Ex. 3, Kozin Dep. Tr.") ("Q: Do you make introductions if a DSP driver is getting let off because
26     the DSP is being terminated from the system? Does any member ever come to you and say: Hey, do you have
    any recommendations? A: Yes. Q: And you have the ability to introduce them to other DSPs at the station? A:
27     Yes. Q: How do you go about doing that? A: So this is not specific to Scoobeez, but in the past, you know, when
    a DSP agreed to do that, we had a meeting with the drivers from the company that was on the exit list. Explained
28     to them the situation, and said here's the other DSPs that are willing to hire you. And they would go ahead and
    apply, talk to the DSP. If they were interested, they would apply; if they weren't, they wouldn't.").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
COSTA MESA

- 22 -

1    Therefore the unclean hands doctrine does not prevent this Court from modifying the

2    automatic stay.

3    **D.    The Balance of the Harms Favors Amending the Automatic Stay.**

4        The harm facing Amazon outweighs any harm that Scoobeez might claim, particularly

5    when viewed in light of the fact that no purpose is served by the continuation of the stay because

6    Amazon will be free to terminate the Agreement when the stay is terminated, either because the

7    Agreement is transferred to a non-debtor third party or following the effective date of any plan of

8    reorganization that may be confirmed in Scoobeez' Chapter 11 case.  *See* 11 U.S.C. § 362(c)(1)

9    (automatic stay as to the stay of an action against property of the estate terminates when "such

10    property is no longer property of the estate.")

11        The fact that Scoobeez will be impacted when Amazon terminates the Agreement is

12    nothing more than the risk that Scoobeez undertook when it entered into an Agreement that

13    provided that either party could terminate the Agreement on 30 days' notice to the other, without

14    cause.  Nothing in the Agreement prevented Scoobeez from diversifying its business.[60]  In fact,

15    Scoobeez had other customers from 2016 until 2018, but made the ill-advised business decision to

16    concentrate all of its business with a single, more profitable customer despite knowing that

17    Amazon could terminate the relationship anytime upon 30 days' notice.[61]  Although Scoobeez

18    claims that it is "always attempting to diversify" its customer base and "[w]ith sufficient runway,

19    Scoobeez management would be able to market to develop new customer opportunities,"

20    **Scoobeez has not added a single new customer in over a year**.[62]  Since receiving notice from

21    Amazon of its intention to terminate the Agreement, Scoobeez' efforts to diversify its business

22    ────────────

23    [60]  *See* Ex. 12, Voskanian Dep. Tr. at 94:17-23, *supra* note 19.

    [61]  *See* Ex. 4, McAvoy Dep. Tr at 107:9-12 & Ex. 12, Voskanian Dep. Tr. at 94:25-95:14, *supra* note 19.

24    [62]  *See* Scoobeez' Supp. Pleading In Support of Motion for Preliminary Injunction, Dkt. 21, Declaration of George
    Voskanian at 7, ¶ 7.

25    Ex. 12, Voskanian Dep. Tr. at 93:21-22 ("We were always attempting to diversify."); 25:14-16 ("Q:…As you sit
    here today, would you say that Amazon is Scoobeez' only client? A: Yes.").

26    Ex. 9, Sheikh Dep. Tr. at 168:14-16 (noting that "[i]f Amazon were to terminate the contract because Amazon is
27    currently its only customer, [Scoobeez] would have no revenue stream…").

    Ex. 13, Weiss Dep. Tr. at 55:8-13 (stating that "[t]here are no signed contracts as of today" between Scoobeez
28    and "any of the entities that either [Mr. Voskanian] or Mr. Sheikh have reached out to").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
COSTA MESA

- 23 -

1   has been limited to cold calling, three LinkedIn messages and preliminary meetings with potential

2   customers.[63]  Any company that received notice that its only client intends to terminate its

3   business ought to have done more in the last four months, and ought to have something to show

4   for its efforts.

5           On the other hand, for four months Amazon has been compelled, to its detriment and in

6   direct conflict with its rights under the Agreement, to provide Scoobeez with business for the

7   "runway" that Scoobeez claims to need to survive without Amazon's business.  Amazon should

8   not be held hostage by Scoobeez' woefully deficient and failed diversification efforts on the mere

9   hope that Scoobeez may someday obtain new clients to support its business.  To the extent there

10   is harm associated with the displacement of Scoobeez' drivers, as is evident from Amazon's

11   proposed, and rejected, separation agreement, Amazon remains willing to assist those drivers with

12   identifying employment opportunities with other DSPs.  Given the Agreement's terms, the actual

13   and potential harm being suffered by Amazon by the continuation of the automatic stay,

14   Amazon's ability to terminate the Agreement immediately after the stay terminates, Scoobeez'

15   demonstrated inability to diversify its business and the transition assistance Amazon can provide

16   to affected Scoobeez' drivers, Amazon should not be prejudiced by the continuation of the stay.

17   Instead, the balance of harms favor the entry of an order modifying the automatic stay so as to

18   permit Amazon to exercise its contractual rights.

19                    **IV.**

20                **<u>CONCLUSION</u>**

21           Scoobeez and Hillair's attempts to wield the automatic stay as a sword to compel Amazon

22   to continue to do business with Scoobeez should be rejected.  On a daily basis, Amazon is being

23   harmed by the lost opportunity cost resulting from its inability to substitute new, superior, DSP

24   2.0s for Scoobeez and by continuing to be exposed to an ever increasing litigation risk.  Scoobeez

25

26

27

28

---

[63]  *See* Ex. 12, Voskanian Dep. Tr. at 95:15-101:7 (describing how Scoobeez is "trying" to secure other agreements for work with entities such as Wal-Mart and Bristol Farms).

Ex. 13, Weiss Dep. Tr. at 54:6-56:17 (discussing Mr. Voskanian's unsuccessful attempts to obtain other business).

Ex. 9, Sheikh Dep. Tr. at 102:23-104:2 (noting that he "didn't receive any responses" from his LinkedIn messages to potential clients).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
COSTA MESA

- 24 -

| | |
|---|---|
| 1 | cannot use the Agreement to reorganize and has not demonstrated that, given time, it can replace |
| 2 | Amazon's business with other clients.  As a result, after enjoying the protection of the automatic |
| 3 | stay for the last ten months in which it continued to receive Amazon's business, it is now time to |
| 4 | permit Amazon to exercise its contractual rights by modifying the stay as requested by Amazon. |

Dated: February 19, 2020                    MORGAN, LEWIS & BOCKIUS LLP


By:   _/s/ Richard W. Esterkin_____
         Richard W. Esterkin
Attorneys for Amazon Logistics, Inc.

**DECLARATION OF JAMES WILSON**

I, James Wilson, declare:

1.     My job title is Senior Manager, Amazon Logistics. In that capacity, I am familiar with the engagement of delivery service providers ("DSPs"), such as Scoobeez, Inc. ("Scoobeez"), by Amazon Logistics, Inc. ("Amazon Logistics") to deliver packages ordered from Amazon.com and related online sites.

2.     Beginning in April 2019, Amazon created a North America DSP Network Health Team to monitor and evaluate its DSP partners.  I, along with Micah McCabe, am a member of the Network Health Team. Shortly after its creation, the Network Health Team developed a framework to identify and eliminate poor DSP partners.

3.     That framework, which originally focused on eliminating 1.0 DSPs (in favor of the preferred 2.0 DSPs) and poor-performing DSPs, was presented to senior Amazon leadership on July 1, 2019, but was immediately rejected.  A true and correct copy of the aforementioned framework is attached hereto as Exhibit A (Bates Numbers AMAZON_H002559-2587).

4.     In its place, Amazon leadership suggested that the Network Health Team create a framework to identify and eliminate DSPs with a certain number of compliance issues or wage-and-hour litigations in which Amazon was named as a co-defendant along with the DSP.  Copies of a series of e-mails between members of the Network Health Team and senior Amazon leadership relating to the adoption of this framework are attached hereto as Exhibit B (Bates Numbers AMAZON_E000715-730).

5.     Attached hereto as Exhibit C is a copy of correspondence that Amazon received from RTR Recovery, LLC, the authorized collection agent for Palm Funding, LLC, on or about March 11, 2019.  I retrieved the aforementioned correspondence from Amazon's records as they are kept in the ordinary and regular course of business.

6.     Attached hereto as Exhibit D is a copy of correspondence that Amazon received from Chrome Cap on or about March 13, 2019.  I retrieved the aforementioned correspondence from Amazon's records as they are kept in the ordinary and regular course of business.

1    correspondence from Amazon's records as they are kept in the ordinary and regular course of

2    business.

3           8.      Attached hereto as Exhibit F is a copy of correspondence that Amazon received

4    from HOP Capital on or about March 20, 2019.  I retrieved the aforementioned correspondence

5    from Amazon's records as they are kept in the ordinary and regular course of business.

6           I declare under penalty of perjury that the foregoing is true and correct and that this

7    declaration was executed at _Nashville, TN_ , _____TN_____ on February _19_ , 2020.

8

9

10                                          /s/ _____

11                                          James Wilson

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
DUBAI

Case 2:20-cv-05290-AB    Document 17-1    Filed 07/07/20    Page 30 of 96    Page ID #:6232

# EXHIBIT A

Case 2:20-cv-03290-AB    Document 17-1    Filed 07/07/20    Page 31 of 96    Page ID #:6283

# EXHIBIT REDACTED

# EXHIBIT B

Case 2:20-cv-03290-AB    Document 17-1    Filed 07/07/20    Page 33 of 96    Page ID #:6285

# EXHIBIT REDACTED

# EXHIBIT C



**RTR Recovery, LLC**
**122 East 42nd, Suite 2112**
**New York, NY 10168**
**Tel.: (718) 775-3673**
**Fax: (888) 259-5884**
Drobinson@rtrrecoveryllc.com
Calcaraz@rtrrecoveryllc.com
Eheng@rtrrecoveryllc.com

March 11, 2019

Amazon.com, Inc.
Corporation Service Company
300 Deschutes Way SW, Suite 304
Tumwater, WA 98501
Attn: Legal Department – UCC Liens

# NOTICE OF UCC DEMAND AND REQUEST FOR ACCOUNTS RECEIVABLE

RE:  **Palm Funding, LLC v Scoobeez/Scoobeez Inc and Shahan Ohanessian,**
located at 640 Irving Aven Glendale, CA 91201.

**FEIN:** ▮▮▮▮▮▮

To Whom It May Concern:

I am the Chief Operating Officer of RTR Recovery, LLC. We are the authorized servicer and collection agent for Palm Funding, LLC ("PFL").

We understand that Amazon.com, Inc has relationship with Scoobeez/Scoobeez Inc and Shahan Ohanessian ("Scoobeez"). Scoobeez is in default on a purchase agreement to PFL. That agreement is secured by a security interest in all the accounts receivable of Scoobeez) a copy of the security agreement and filed UCC is attached hereto).

Because of Scoobeez' default, all its accounts now belong to PFL. Therefore, under UCC Section 9-406, demand is hereby made upon to put a hold on any funds owed and not remit them to Scoobeez, **and to instead pay those funds directly to RTR Recovery as the Merchant's agent and attorney.** Under the UCC, once our client has given formal notice under the UCC of its enforcement of its security interest, and accurately identified the collateral, (See attached UCC

provision, Section 9-406 of the Uniform Commercial Code), may discharge its obligation by paying our client and "*may not discharge the obligation by paying the assignor* [ Scoobeez]" (UCC 9.406). Therefore, the UCC requires you to pay any accounts receivable to our client and **not** pay them to Scoobeez.

If you want to conduct an investigation into this matter, or further review the requirements under the UCC, I suggest you put a hold on those funds and put them into a separate reserve or trust account pending your investigation.

Scoobeez currently owes PFL $507,022.30.

If you have any questions, feel free to contact us at the above referenced numbers, or email our UCC Liens Processing Department.

Very truly yours,

*Douglas Robinson*

By:    Douglas Robinson
Chief Operating Officer
General Counsel for Judgment-Creditor

167543531762

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Online Dept. - 888-507-4593

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

FIRST CORPORATE SOLUTIONS INC.
914 S Street

SACRAMENTO CA. 95811

UCC1-172561                          State of California

167543531762
8/29/2016
This acknowledgment reflects the information as transmitted
to the State of California.

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Scoobeez / Scoobeez, Inc. | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 1328 Doverwood Dr. | Glendale | CA  91207 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| CAPCALL, LLC | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 122 E 42nd Street Ste 2112 | New York | NY  10168 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All now owned and hereafter acquired accounts; chattel paper; deposit accounts; contract rights;letter of credit
rights; instruments; payment and general intangibles; goods; inventory; equipment and fixtures; investment
property; and all books and records relating to all of the foregoing property, including, without limitation, all
computer programs; and all proceeds of the foregoing. NOTICE PURSUANT TO AN AGREEMENT
BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER
THE COLLATERAL DESCRIBED HEREIN, THE ENCUMBERING OF WHICH MAY CONSTITUTE THE
TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCES.  IN
THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTORS ACCOUNTS,
CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
[UCC1-172561]

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)
International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

| 9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐ | | |
|---|---|---|
| 9a. ORGANIZATION'S NAME | | |
| OR Scoobeez / Scoobeez, Inc. | | |
| 9b. INDIVIDUAL'S SURNAME | | |
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX | |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

10. DEBTOR'S NAME: Provide (10a or 10b) only **one** additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 10b. INDIVIDUAL'S SURNAME | | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 11. ☐ ADDITIONAL SECURED PARTY'S NAME **or** ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only **one** name (11a or 11b) | | | |
|---|---|---|---|
| 11a. ORGANIZATION'S NAME | | | |
| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 11c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: |
|---|---|
| | ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing |
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Online Dept. - 888-507-4593

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

FIRST CORPORATE SOLUTIONS INC.
914 S Street

SACRAMENTO CA. 95811

UCC3-172561.1                                   State of California

1977009953
3/7/2019
This acknowledgment reflects the information as transmitted to the State of California.

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
167543531762   8/29/2016

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☒ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                          **AND** Check one of these three boxes to:

This Change affects ☐ Debtor or ☒ Secured Party of record   ☒ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c   ☐ ADD name: Complete item 7a or 7b, and item 7c   ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
OR | CAPCALL, LLC | | | |

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
OR | PALM FUNDING, LLC | | | |

| 7b. INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 122 E 42nd St Suite 2112 | New york | NY | 10168 | USA |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
OR | CAPCALL, LLC | | | |

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

**10. OPTIONAL FILER REFERENCE DATA:**
[UCC3-172561.1]

International Association of Commercial Administrators (IACA)

**FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)**

## PALM FUNDING, LLC
## MERCHANT AGREEMENT

Agreement dated 12/03/2018    between PALM FUNDING, LLC ("PF") and the merchant listed below ("the Merchant").
(Month) (Day) (Year)

**MERCHANT INFORMATION**

Merchant's Legal Name: SCOOBEEZ/SCOOBEEZ INC

D/B/A: SAME AS ABOVE      State of Incorporation / Organization: CA

Type of entity: ◉ Corporation ○ Limited Liability Company ○ Limited Partnership ○ Limited Liability Partnership ○ Sole Proprietor

Physical Address: 640 IRVING AVE    City: GLENDALE    State: CA    Zip: 91201

Mailing Address: 1328 DOVERWOOD DR    City: GLENDALE    State: CA    Zip: 91207

Date business started (mm/yy): _____    Federal ID# _____

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to PF (making PF the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Total Gross Receipts," hereinafter "Receipts," defined as all payments made by cash, check, credit or debit card, electronic transfer or other form of monetary payment in the ordinary course of the merchant's business without subtracting any costs or expenses), for the payment of Merchant's sale of goods or services until the amount specified below (the "Purchased Amount") has been remitted from the Merchant to PF.

The Purchased Amount shall be paid to PF by Merchant's irrevocably authorizing only one depositing account acceptable to PF (the "Account") to remit the percentage of daily receipts specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each transaction, until such time as PF receives payment in full of the Purchased Amount. Merchant hereby authorizes PF to ACH Debit the specified remittances from the Merchant's bank account on a daily basis and will provide PF with all required access codes to view the account, and monthly bank statements. Merchant understands that it is responsible for ensuring that the Specified percentage to be debited by PF remains in the account and will be held responsible for any fees incurred by PF resulting from a rejected ACH attempt or an event of default. (See Appendix A). PF is not responsible for any overdrafts or rejected transactions that may result from PF's ACH debiting the specified amounts under the terms of this agreement. PF will either (i) debit the Specified Percentage on a daily basis, or (ii) if a Specific Daily Amount is specified hereunder, then PF shall debit the Specific Daily Amount on each business day, and upon Merchant's request, and receipt of the Merchant's monthly bank statements, PF shall, on or about the fifteenth day of each month, reconcile the Merchant's account by either crediting or debiting the difference between the amount debited and the Specified Percentage, from or back to the Merchant's bank account so that the amount debited each month equals the Specified Percentage. PF may, upon Merchant's request, adjust the amount of any payment due under this Agreement at PF's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between PF and Merchant, upon violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this agreement are annexed hereto in Appendix A.

Purchase Price: $ 400,000.00    Specified Percentage: % 15    Specific Daily Amount: $ 4,863.00    Receipts Purchased Amount: $ 583,600.00

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH ON PAGE 2, THE "MERCHANT SECURITY AGREEMENT" AND "ADMINISTRATIVE FORM HEREOF ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

**FOR THE MERCHANT (#1)**
By SHAHAN OHANESSIAN
   (Print Name and Title)      (Signature)    [SIGN HERE]
**FOR THE MERCHANT (#2)**
By _____
   (Print Name and Title)      (Signature)    [SIGN HERE]
**OWNER/GUARANTOR #1**
By SHAHAN OHANESSIAN
   (Print Name)      (Signature)    [SIGN HERE]
**OWNER/GUARANTOR #2**
By _____
   (Print Name)      (Signature)    [SIGN HERE]
**TVT CAPITAL, LLC**

By _____      Sales Associate Name _____
  (Company Officer)                        (Signature)

To the extent set forth herein, each of the parties is obligated upon his, her or its execution of the Agreement to all terms of the Agreement, including the Additional Terms set forth below. Each of above-signed Merchant and Owner(s) represents that he or she is authorized to sign this Agreement for Merchant, legally binding said Merchant to repay this obligation and that the information provided herein and in all of PF documents, forms and recorded interviews is true, accurate and complete in all respects. If any such information is false or misleading, Merchant shall be deemed in material breach of all agreements between Merchant and PF and PF shall be entitled to all remedies available under law. PF may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant via Processor and/or Operator to PF. An investigative or consumer report may be made in connection with the Agreement. Merchant and each of the above-signed Owners authorizes PF, its agents and representatives and any credit reporting agency engaged by PF, to (i) investigate any references given or any other statements or data obtained from or about Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as Merchant and/or Owners(s) continue to have any obligation owed to PF as a consequence of this Agreement or for PF's ability to determine Merchant's eligibility to enter into any future agreement with Company.

**ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.**

1

MERCHANT AGREEMENT TERMS & CONDITIONS

## I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to PF, and appoint a Bank acceptable to PF, to obtain electronic fund transfer services and/or ACH payments. Merchant shall provide PF and/or its authorized agent with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts and deposits into the account. Merchant shall authorize PF and/or it's agent to deduct the amounts owed to PF for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant from electronic check transactions, or other payment processing transactions, and to pay such amounts to PF by permitting PF to withdraw the specified percentages by ACH debiting of the account. The authorization shall be irrevocable absent PF's written consent.

**1.2 Term of Agreement.** This Agreement shall have a term of one year. Upon the expiration of the term, this Agreement shall automatically renew for successive one-year terms, provided, however, that during the renewal term(s) Merchant may terminate this Agreement upon ninety days' prior written notice (effective upon receipt) to PF, however, said termination of this Agreement shall not affect Merchant's responsibility to satisfy all outstanding obligations to PF at the time of termination. Notwithstanding the foregoing, should Merchant elect to terminate this agreement in accordance with this paragraph "1.2" herein, but Merchant shall fail to fully satisfy its obligation to PF, then Merchant's termination shall have no effect, and this Agreement shall remain in full force and effect.

**1.3 Future Purchases.** PF reserves the right to rescind the offer to make any purchase payments hereunder, in its sole discretion.

**1.4 Financial Condition.** Merchant and Guarantor(s) authorize PF and its agents to investigate their financial responsibility and history, and will provide to PF any bank or financial statements, tax returns, etc., as PF deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. PF is authorized to update such information and financial profiles from time to time as it deems appropriate.

**1.5 Transactional History.** Merchant authorizes their bank to provide PF with Merchant's banking and/or credit-card processing history to determine qualification or continuation in this program.

**1.6 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by PF for monies owed to PF from Merchant and (b) actions taken by Processor in reliance upon information or instructions provided by PF.

**1.7 No Liability.** In no event will PF be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and Guarantor(s).

**1.8 Reliance on Terms.** Section 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, PF and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.9 Sale of Receipts.** Merchant and PF agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from PF to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement equals the fair market value of such Receipts. PF has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to PF in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts be deemed as interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that PF has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and PF shall promptly refund to Merchant any interest received by PF in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that PF not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law.

**1.10 Power of Attorney.** Merchant irrevocably appoints PF as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to PF from Processor, or in the case of a violation by Merchant of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to PF; and (v) to file any claims or take any action or institute any proceeding which PF may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

2

**1.11 Protections Against Default.** The following Protections through are invoked by PF, immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the PF electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse to PF; (c) Merchant changes the electronic check processor or other payment processor through which the Receipts are settled from Processor to another electronic check processor or other payment processor, or permits any event to occur that could cause diversion of any of Merchant's check transactions to another processor; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God) transfers, moves, sells, disposes, transfers or otherwise conveys its business or assets without (i) the express prior written consent of PF, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to PF; or (e) Merchant takes any action, fails to take any action, or offers any incentive— economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than checks that are settled through Processor. These protections are in addition to any other remedies available to PF at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** PF may enforce the provisions of the Personal Guarantee of Performance against the Guarantor.

**Protection 3.** Merchant shall, upon execution of this Agreement, deliver to PF an executed confession of judgment in favor of PF in the amount of the Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, PF may enter that confession of judgment as a judgment with the Clerk of the Court and execute thereon.

**Protection 4.** PF may enforce its security interest in the Collateral identified in the security agreement herein.

**Protection 5.** The entire Purchase Amount shall become immediately refundable to PF from Merchant.

**Protection 6.** PF may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, in which PF shall recover judgment against Merchant, Merchant shall be liable for all of PF's costs of lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** Merchant shall, upon execution of this Agreement, deliver to PF an **executed assignment of lease of Merchant's premises** in favor of PF. Upon breach of any provision in this paragraph 1.12, PF may exercise its rights under such assignment of lease.

**Protection 8.** PF may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise, in an amount consistent with the Specified Percentage of Specific Daily Amount.

**Protection 9.** PF shall have the right, without waiving any of its rights and remedies and without notice to Merchant and/or Guarantor(s), to notify Merchant's credit card processor of the sale of Receipts hereunder and to direct such credit card processor to make payment to PF of all or any portion of the amounts received by such credit card processor on behalf of Merchant, Merchant hereby grants to PF an irrevocable power-of-attorney, which power-of-attorney shall be coupled with an interest, and hereby appoints PF or any of PF's representatives as Merchants attorney-in-fact, to take any and all action necessary to direct such new or additional credit card processor to make payment to PF as contemplated by this Section.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner, in respect of himself or herself personally, authorizes PF to disclose information concerning Merchant's and each Owner's credit standing (including credit bureau reports that PF obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner hereby waives to the maximum extent permitted by law any claim for damages against PF or any of its affiliates relating to any (i) investigation undertaken by or on behalf of PF as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by PF, including this Agreement and any other PF documentations (collectively, "Confidential Information") are proprietary and confidential information of PF. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of PF to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 1.13.

**1.14 Publicity.** Merchant and each Owner only authorizes PF to use its, his or her name in a listing of clients and in advertising and marketing materials with their express written consent. '

**1.15 D/B/A's.** Merchant hereby acknowledges and agrees that PF may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between PF and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

## II. REPRESENTATIONS, WARRANTIES & COVENANTS.

Merchant represents, warrants and covenants that as of this date and during the term of this Agreement:

**2.1 Financial Condition and Financial Information.** Its bank and financial statements, copies of which have been furnished to PF, and future statements which will be furnished hereafter at the discretion of PF, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise PF of any material adverse change in its financial condition, operation or ownership. PF may request statements at any time during the performance of this Agreement and the Merchant shall provide them to PF within 5 business days. Merchant's failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance.** Merchant will maintain business-interruption insurance naming PF as loss payee and additional insured in amounts and against risks as are satisfactory to PF and shall provide PF proof of such insurance upon request.

**2.5 Electronic Check & Payment Processing Agreement.** Merchant will not change its processor, add terminals, change its financial institution or bank account(s) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without PF's prior written consent. Any such change shall be a material breach of this Agreement.

**2.6 Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and PF or change any of its places of business.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at any time, and from time to time, upon at least one (1) day's prior notice from PF to Merchant, execute, acknowledge and deliver to PF and/or to any other person, person firm or corporation specified by PF, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy.** As of the date of this Agreement, Merchant does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. In the event that the Merchant files for bankruptcy protection or is placed under an involuntary filing Protections 2 and 3 are immediately invoked.

**2.10 Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales with any party other than PF.

**2.11 Unencumbered Receipts.** Merchant has good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of PF.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/ or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Default Under Other Contracts.** Merchant's execution of and/ or performance under this Agreement will not cause or create an event of default by Merchant under any contract with another person or entity.

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) Merchant shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Merchant seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (d) the sending of notice of termination by Guarantor; (e) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (f) Merchant shall transfer or sell all or substantially all of its assets; (h) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (i) Merchant shall use multiple depository accounts without the prior written consent of PF; (j) Merchant shall change its depositing account without the prior written consent of PF; (k) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; or (l) Merchant shall default under any of the terms, covenants and conditions of any other agreement with PF.

**3.2 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4.1 hereof, PF may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy. All rights, powers and remedies of PF in connection with this Agreement

4

may be exercised at any time by PF after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.3 Costs.** Merchant shall pay to PF all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and (b) the enforcement of PF's remedies set forth in Section 4.2 above, including but not limited to court costs and attorneys' fees.

**3.4 Required Notifications.** Merchant is required to give PF written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give PF seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## IV. MISCELLANEOUS

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by PF.

**4.2 Assignment.** PF may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective only upon receipt.

**4.4 Waiver Remedies.** No failure on the part of PF to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, PF and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of PF which consent may be withheld in PF's sole discretion. PF reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if PF so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by PF to transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.8 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and Security Agreement hereto embody the entire agreement between Merchant and PF and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.9 JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

**4.10 CLASS ACTION WAIVER. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**4.11 Facsimile Acceptance.** Facsimile signatures shall be deemed acceptable for all purposes.

Initials: _____

5

Merchant's Legal Name: **SCOOBEEZ/SCOOBEEZ INC**    D/B/A: **SAME AS ABOVE**

Physical Address: **640 IRVING AVE**    City: **GLENDALE**    State: **CA**    Zip: **91201**

Federal ID# _____

## SECURITY AGREEMENT

**Security Interest.** To secure Merchant's payment and performance obligations to PF under the Merchant Agreement (the "Factoring Agreement"), Merchant hereby grants to PF a security interest in (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant; and (b) all proceeds, as that term is defined in Article 9 of the UCC (a and b collectively, the "Collateral").

**Cross-Collateral.** To secure Guarantor's payment and performance obligations to PF under this Security Agreement and Guaranty (the "Agreement"), Guarantor hereby grants PF a security interest in_____ (the "Additional Collateral"). Guarantor understands that PF will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement. Merchant and Guarantor each acknowledge and agree that any security interest granted to PF under any other agreement between Merchant or Guarantor and PF (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as PF deems necessary to perfect or maintain PF's first priority security interest in the Collateral, the Additional Collateral and the Cross-Collateral, including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes PF to file any financing statements deemed necessary by PF to perfect or maintain PF's security interest, which financing statement may contain notification that Merchant and Guarantor have granted a negative pledge to PF with respect to the Collateral, the Additional Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with PF's rights. Merchant and Guarantor shall be liable for and PF may charge and collect all costs and expenses, including but not limited to attorney's fees, which may be incurred by PF in protecting, preserving and enforcing PF's security interest and rights. Merchant further acknowledges that PF may use another legal name and/or D/B/A when designating the Secured Party, when the PF files the above-referenced financing statement(s).

**Negative Pledge.** Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral , the Additional Collateral or the Cross-Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** PF shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, PF may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that PF may enter into an agreement with Merchant's landlord giving PF the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and (b) to assign Merchant's lease to another qualified Merchant capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default, PF may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration or otherwise.

## GUARANTY

**Personal Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to PF Merchant's performance of all of the representations, warranties, covenants made by Merchant in this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due (i) at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in this Agreement and the Merchant Agreement, and (ii) at the time Merchant admits its inability to pay its debts, or makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Merchant seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts.

**Guarantor Waivers.** In the event that Merchant fails to make a payment or perform any obligation when due under the Merchant Agreement, PF may enforce its rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral, Additional Collateral or Cross-Collateral PF may hold pursuant to this Agreement or any other guaranty. PF does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any

6

adverse change in Merchant's financial condition; (iii) any impairment or disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) PF's acceptance of this Agreement ; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to PF. In addition, PF may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement : (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to PF; (ii) release Merchant from its obligations to PF; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to PF under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation ; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that PF must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.**

**MERCHANT #1**

By DIAHAN OHANESSIAN
_____
(Print Name and Title)

SS# _____

**MERCHANT #2**

By _____
(Print Name and Title)

SS# _____

**OWNER/GUARANTOR #1**

By DIAHAN OHANESSIAN
_____
(Print Name)

SS# _____

**OWNER/GUARANTOR #2**

By _____
(Print Name)

SS# _____

✖ _____
(Signature)
Driver's License Number: _____

✖ _____
(Signature)
Driver's License Number: _____

✖ _____
(Signature)
Driver's License Number: _____

✖ _____
(Signature)
Driver's License Number: _____

SIGN HERE

SIGN HERE

SIGN HERE

SIGN HERE

7

## AUTHORIZED SERVICING AGENT – E ADVANCE SERVICES, LLC

E ADVANCE SERVICES, LLC is the independent authorized Servicing Agent of PALM FUNDING, LLC for this Agreement providing administrative, bookkeeping, reporting, and support services for PALM FUNDING, LLC and the Merchant. E ADVANCE SERVICES, LLC is not affiliated with, or owned by, PALM FUNDING, LLC and is acting as independent agent for services including but not limited to background checks, credit checks, general underwriting review, filing UCC-1 security interests cash management, account reporting, remittance and receipts collection. E ADVANCE SERVICES, LLC may, at its sole discretion, participate in this facility by providing a portion of the funds for this transaction directly to PALM FUNDING, LLC. E ADVANCE SERVICES, LLC is not a credit card processor, or in the business of processing credit cards. Merchant and Owner/ Guarantor hereby acknowledge that in no event shall E ADVANCE SERVICES, LLC be liable for any claims made against PALM FUNDING, LLC or the Processor under any legal theory for lost profits, lost revenues, lost business opportunity, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by the Merchant and Owner/ Guarantor. As such, Merchant hereby authorizes E ADVANCE SERVICES, LLC as the appointed Merchant Agreement servicing agent for PALM FUNDING, LLC to initiate ACH Debits (Withdrawals) from Merchant's bank account for the payment of the Purchased Amount as it becomes due and payable under the terms of the Merchant Agreement. Furthermore, Merchant represents and warrants that it is the owner of the Account or has the full authority to grant this authorization. If there are any questions in regard to an electronic debit
(withdrawal) from the Account, you may contact E ADVANCE SERVICES, LLC 877-290-9070

MERCHANT #1
By _____
_____ (Print Name and Title)
SS# _____

**X** _____
         (Signature)
Driver's License Number: _____

MERCHANT #2
By _____
_____ (Print Name and Title)
SS# _____

**X** _____
         (Signature)
Driver's License Number: _____

OWNER/GUARANTOR #1
By SHAHAN OHANESSIAN
_____ (Print Name)
SS# _____

**X** _____
         (Signature)
Driver's License Number: _____

OWNER/GUARANTOR #2
By _____
_____ (Print Name)
SS# _____

**X** _____
         (Signature)
Driver's License Number: _____

8

PALM FUNDING, LLC

# APPENDIX A: THE FEE STRUCTURE
## UNDERWRITING & ACH PROGRAM FEE
TOTAL FEES: 5%

B. NSF FEE (STANDARD) - $35.00 EACH

UP TO FOUR TIMES ONLY BEFORE A DEFAULT IS DECLARED

C. REJECTED ACH - $100

WHEN THE MERCHANT DIRECTS THE BANK TO REJECT OUR ACH.

D. BANK CHANGE FEE - $50.00
WHEN THE MERCHANT REQUIRES CHANGE OF ACCOUNT TO BE DEBITED
REQUIRING PALM FUNDING LLC TO RECONFIGURE ACH COLLECTIONS.

E. BLOCKED ACCOUNT - $2,500.00
WHEN THE MERCHANT BLOCKS ACCOUNT FROM OUR DEBIT ACH WHICH PLACES
THEM IN DEFAULT (PER CONTRACT)

F. DEFAULT FEE - $2,500.00
WHEN THE MERCHANT CHANGES BANK ACCOUNTS CUTTING US OFF FROM
COLLECTIONS

G. ACH FEE - $15.00

H. WIRE TRANSFER FEE - $35.00
I. UCC RELEASE – $150.00

**MISCELLANEOUS SERVICE FEES.** MERCHANT SHALL PAY CERTAIN FEES FOR SERVICES RELATED TO THE
ORIGINATION AND MAINTENANCE OF ACCOUNTS WHICH MAY INCLUDE BUT NOT BE LIMITED TO:
MERCHANTS FUNDING IS DONE ELECTRONICALLY TO THEIR DESIGNATED BANK ACCOUNT AND
CHARGED A FEE OF $35.00 FOR A FED WIRE OR $15.00 FOR AN ACH. THE FEE FOR UNDERWRITING AND
ORIGINATION IS PAID FROM THE FUNDED AMOUNT IN ACCORDANCE WITH THE SCHEDULE ON THIS
PAGE. IF MERCHANT IS UTILIZING A BRIDGE / CONTROL ACCOUNT, THERE IS AN UPFRONT FEE OF $395.00
FOR THE BANK FEES AND ADMININSTRATIVE COSTS OF MAINTAINING SUCH ACCOUNT FOR EACH CASH
ADVANCE AGREEMENT WITH MERCHANT. FUND TRANSFERS FROM BRIDGE / CONTROL ACCOUNTS TO
MERCHANT'S OPERATING BANK ACCOUNT WILL BE CHARGED $10.95 PER MONTH VIA ACH. THIS FEE
WILL CONTINUE IF THE BRIDGE ACCOUNT REMAINS OPEN AFTER THE RTR IS PAID. MERCHANT WILL BE
CHARGED $50.00 FOR EACH CHANGE OF ITS OPERATING BANK ACCOUNT ONCE ACTIVE WITH TVT. ANY
ADMININSTRATIVE ADJUSTMENTS ASSOCIATED WITH CHANGES TO THE SPECIFIED PERCENTAGE WILL
INCUR A FEE OF $75.00 PER OCCURRENCE. (ALL FEES ARE SUBJECT TO CHANGE)

9

MERCHANT INITIALS:_____



**PALM FUNDING, LLC**

I <u>SHAHAN OHANESSIAN</u> authorize PALM FUNDING, LLC to initiate funds from the checking account indicated below. I also authorize my depository financial institution to honor this transfer.

This authorization is valid for this transaction only. The transaction amount will be $_____.

I have read and agree to all of the terms and conditions on this page and any other contract or document that accompanies this agreement. I certify that I am the authorized account holder for this checking account. I understand this is a binding agreement and I will receive a copy of each check draft in my statement when the item has cleared.

I understand this is a legal binding agreement between PALM FUNDING, LLC and <u>SHAHAN OHANESSIAN</u>.

I understand that all returned checks are subject to a $25.00 NSF fee. This agreement will remain in effect until PALM FUNDING, LLC receives my written notice of cancellation via mail, fax or email.

✖ _____

Authorized Account holder Signature
(required)

12/03/2018
_____
Date (required)

_____
Authorized Account Routing Number

_____
Authorized Bank Account Number

_____
Account Billing Address

_____
Account Telephone Number

10

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Seller should keep this important legal document for Seller's records.

**DISBURSMENT OF ADVANCE PROCEEDS.** By signing below, Seller authorizes Buyer to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Seller later identifies and is acceptable to Buyer) (hereinafter referred to as the "Designated Checking Account") This authorization is to remain in full force and effect until Buyer has received written notification from Seller of its termination in such time and in such manner as to afford Buyer and Seller's depository bank a reasonable opportunity to act on it.

**BUSINESS PURPOSE ACCOUNT.** By signing below, Seller attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

**MISCELLANEOUS.** Buyer is not responsible for any fees charged by Seller's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Seller's account must comply with the provisions of U.S. law.

I, (We) SCOOBEEZ/SCOOBEEZ INC Hereby Authorize, **PALM FUNDING, LLC**
(Hereinafter known as "PF") to Electronically (ACH) debit the Bank Account Below, of which I am a signer:

Bank Name: _____     Branch: _____

                                      DDA:

ABA Routing: _____     Account: _____

For the amount of: $ 4,863.00          (Or) Percentage of each Banking Deposit: % 15

On the Following Days: **MONDAY-FRIDAY**

This authorization is to remain in full force and effect until PF has received written notification from me at least 5 banking days prior of its termination to afford PF a reasonable opportunity to act on it.

Signer :( Print Name /Title) _____     Date: _____

11

**Bank Login Authorization**

Dear Merchant,

Thank you for accepting this offer from PF. We look forward to being your funding partner for as long as you need

ACH Program:

PF, will require viewing access to your bank account, each business day, in order to calculate the amount of your daily payment. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it.

PF will also require viewing access to your bank account, prior to funding, as part of our underwriting process. **The requested access is for "look in" or viewing purposes only, PF is not requesting any change or modification access to your account.**

Please fill out the form below with your information necessary to access your account. *Be sure to indicate capital or lower case letters.

Name of Bank: _____

**Bank Portal Website:** _____

**Username:** _____

**Password:** _____

**Security Question/Answer 1:** _____

**Security Question/Answer 2:** _____

**Security Question/Answer 3:** _____

**Any other information necessary to access your account:** _____

---

**AGREED AND ACKNOWLEDGED:**

Signature: ✗ _____   Date: 12 / 5 / 2018
                     Owner

**Print Name: (owner's name)** SHAHAN OHANESSIAN

**Company Name: (legal entity)** SCOOBEEZ/SCOOBEEZ INC

**Address: (merchant's business address)** _____

Business Phone: (merchant's business phone number) _____

Please note: In the event that we are unable to access your account, we will take a daily estimate payment. An additional $39 fee will be assessed for each day we don't have access. Please be advised that failure to timely reestablish our access ability is an "Event of Default" as well as a breach of contract.
All remedies available to us will be pursued and penalties will be enforced.

12

**PRESS FIRMLY TO SEAL**

**PRESS FIRMLY TO SEAL**

PRIORITY MAIL
FLAT RATE
POSTAGE REQUIRED



# UNITED STATES
# POSTAL SERVICE®

# PRIORITY®
# MAIL

- Date of delivery specified*
- USPS TRACKING™ included to many major international destinations.
- Limited international insurance.
- Pick up available.*
- Order supplies online.*
- When used internationally, a customs declaration label may be required.

**\* Domestic only**



P S 0 0 0 0 1 0 0 0 0 0 1 4

EP14F Oct 2018
OD: 12 1/2 x 9 1/2

To schedule free
Package Pickup,
scan the QR code.



USPS.COM/PICKUP

**P**



U.S. POSTAGE PAID
NEOPOST USA
ePostage

## PRIORITY MAIL 2-DAY™

RTR RECOVERY
122 E 42ND ST FL 21
NEW YORK NY 10168

Ship Date: 03/12/19
Flat Rate Env
**0006**

C017

LEGAL DEPT UCC LIENS
AMAZON.COM INC
STE 304
300 DESCHUTES WAY SW
TUMWATER WA 98501-7719

### USPS TRACKING # EP



**9205 8901 1220 3928 2199 51**

# EXHIBIT D



*THE LAW FIRM OF*

# JOE LIEBERMAN

March 13, 2019

## UCC LIEN NOTICE: FOR YOUR IMMEDIATE ATTENTION

To: Amazon Payments
Attn: Legal Department
RE: ABT HOLDINGS INC. / SCOOBEEZ INC. DBA SCOOBEEZ / SCOOBEEZ GLOBAL INC
/ ABT MINING CO INC, ▮▮▮▮▮▮ & SHAHAN OHANESSIAN, ▮▮▮▮▮▮
Balance due to CHROME CAP: $435,077.81

Dear Sir/Madam,

I represent CHROME CAP in the above matter. This notice is being sent pursuant to UCC
9-406. We understand that you may have a balance owed to ABT HOLDINGS INC. / SCOOBEEZ
INC. DBA SCOOBEEZ / SCOOBEEZ GLOBAL INC / ABT MINING CO INC or SHAHAN
OHANESSIAN (the "Merchant"). Pursuant to the enclosed Agreement, CHROME CAP
purchased $419,700.00 of the Merchant's future accounts. In accordance with the Agreement,
CHROME CAP filed a UCC-1 financing statement with the Secretary of State of CA, thereby
obtaining a perfected security interest in the Merchant's assets, including without limitation, the
Merchant's account receivables. A copy of the UCC-1 is also enclosed herein for your reference.
**The Merchant has breached the Agreement due to non-payment of the receivables and
therefore is currently in default**.

It has come to CHROME CAP's attention that you may have a balance owed to the
Merchant or have been holding funds for the Merchant. This notice is to inform you that not
forwarding said funds to our firm in trust for CHROME CAP is a violation of the UCC, and hereby
interfering with the Agreement entered into by and between the Merchant and CHROME CAP.
Please direct all funds owed by you on behalf of the Merchant, or collected by you on behalf of
the Merchant, to this firm until the amount of $435,077.81 accrues.

Please contact me with any questions.

*/s/ Joe Lieberman*
Joe Lieberman, Esq.
**The Law Firm of Joe Lieberman P.C.**
124 Grove Avenue, PO Box 356
Cedarhurst, NY 11516
T: (718) 316-6893
E: joe@liebermanlegal.com

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC   1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

1608 57101
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: California
(S.O.S.)

Initial Filing #: 197701744999
Initial Book #:
Initial Page #:
Initial Filing Date: 3/12/2019

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME ABT HOLDINGS INC. / SCOOBEEZ INC. DBA SCOOBEEZ / SCOOBEEZ GLOBAL INC / ABT MINING CO INC | | | | |
|---|---|---|---|---|
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 396 S PASADENA AVE | CITY Pasadena | STATE CA | POSTAL CODE 91105 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME Chrome Cap | | | | |
|---|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 366 NORTH BROADWAY, | CITY Jericho | STATE NY | POSTAL CODE 11753 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
ASSETS INCLUDING PROCEEDS AND PRODUCTS
ACCOUNT(S) INCLUDING PROCEEDS AND PRODUCTS
CHATTEL PAPER INCLUDING PROCEEDS AND PRODUCTS
INVENTORY INCLUDING PROCEEDS AND PRODUCTS
EQUIPMENT INCLUDING PROCEEDS AND PRODUCTS
NEGOTIABLE INSTRUMENTS INCLUDING PROCEEDS AND PRODUCTS
GENERAL INTANGIBLE(S) INCLUDING PROCEEDS AND PRODUCTS

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
1608 57101

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)
This document was auto-generated from data received from the California Department of State

Exhibit A, Page 64

# CHROME CAP $

## AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIPTS

| Seller's Legal Name: | | ABT HOLDINGS, INC. / SCOOBEEZ, INC. / SCOOBEEZ GLOBAL INC / ABT MINING CO INC | |
|---|---|---|---|
| D/B/A: | | SCOOBEEZ | |
| Form of Business Entity: | | CORPORATION | |
| Street Address: | 225 S Lake Ave #300 | City: | PASADENA |
| State: | CA | Zip: | 91101 |
| Mailing Address: | 396 S PASADENA AVE | City: | PASADENA |
| State: | CA | Zip: | 91105 |
| Primary Contact Name: | SHAHAN OHANESSIAN | Title: | Owner |

| Federal Tax ID Number: | |
|---|---|

| Purchase Price: | $300,000.00 |
|---|---|
| Purchased Amount: | $419,700.00 |
| Daily Amount: | $41,970.00 |
| Specified Percentage: | 12% |

| Account for the Deposit of All Future Receipts:   Bank: |
|---|
| Account No: |

CHROME CAP

03/13/2019 8:29 AM          14154847068          → 12062667010          pg 4 of 11

Case 2:19-bk-13989-WB    Doc 605  17 Filed 02/19/20  Entered 02/19/20 16:30:44  Desc
Main Document          Page 66 of 239          Page 2 of 16

Effective, **DECEMBER 18, 2018** Seller, identified above, hereby sells, assigns and transfers to CHROME CAP, located at 366 NORTH BROADWAY, JERICHO, NY 11753 ("Buyer"), without recourse, the Specified Percentage of the proceeds of each future sale made by Seller (collectively "Future Receipts") until Seller has received the Purchased Amount.

"Future Receipts" includes all payments made by cash, check, or other electronic transfer, credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card") or other form of monetary payment in the ordinary course of Seller's business.

As payment for the Purchased Amount, Buyer will deliver to Seller the Purchase Price, shown above, minus any Origination Fee shown above.

Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer.

Both parties agree that the obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee.

Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to the Account and the ability to withdraw the Initial Daily Amount.

If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial.

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes.

ABT HOLDINGS, INC. / SCOOBEEZ, INC. / SCOOBEEZ GLOBAL INC / ABT MINING CO INC

Seller: _____

Agreed to by: _____
(Signature)

Print Name & Title: **SHAHAN OHANESSIAN**

Agreed to by: _____
(Signature)

Print Name & Title: _____

Buyer: _____

Agreed to by: _____
(Signature)

_____
(Title)

CHROME CAP

03/13/2019 8:29 AM     14154847068     → 12062667010     pg 5 of 11

Case 2:19-bk-12389-AWB   Doc 605-17   Filed 02/19/20   Entered 02/19/20 16:29:41   Desc
Main Document     Page 67 of 239     Page 3 of 16

1. **Delivery of Purchased Amount:** Seller must deposit all Future Receipts into the single business banking account specified above, which may not be used for any personal, family or household purposes (the "Account") and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor"), to deposit all Payment Card receipts of Seller into them Account. Seller agrees not to change the Account or add an additional Account without the express written consent of Buyer. Seller authorizes Buyer to debit the Daily Amount from the Account each business day by either ACH debit or electronic check. Seller will provide Buyer with all required access codes and login information and agrees not to change them without prior written consent from Buyer. Seller understands that Buyer must have access and login to the Account at all times during the term of this Agreement, and any attempt to block Buyer's access to the Account constitutes an Event of Default under this Agreement. Seller will provide an appropriate ACH authorization to Buyer. Seller understands that it is responsible for either ensuring that the Daily Amount is available in the Account each business day or advising Buyer prior to each daily withdrawal of a shortage of funds. Otherwise, Seller will be responsible for any fees incurred by Buyer resulting from a rejected electronic check or ACH debit attempt, as set forth on Appendix A. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement. Seller understands that the foregoing ACH authorization is a fundamental condition to induce Buyer to accept the Agreement. Consequently, such authorization is intended to be irrevocable.

2. **Seller May Request Changes to the Daily Amount:** The initial Daily Amount is intended to represent the Specified Percentage of Seller's daily Future Receipts. For as long as no Event of Default has occurred, once each calendar month, Seller may request that Buyer adjust the Daily Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation. No more often than once a month, Buyer may adjust the Daily Amount on a going-forward basis to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Buyer will give Seller notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

3. **Daily Amount Upon Default:** Upon the occurrence of an Event of Default, the Daily Amount shall equal 100% of all Future Receipts.

4. **Sale of Future Receipts (THIS IS NOT A LOAN):** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. If Future Receipts are remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is never remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement, Seller would not owe anything to Buyer and would not be in breach or default under this Agreement. Buyer is buying the Purchased Amount of Future Receipts knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein. Seller agrees that it will treat Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns. Seller agrees that Buyer is entitled to audit Seller's accounting records upon reasonable Notice in order to verify compliance. Seller waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Seller asserts that this transaction is anything other than a sale of future receipts.

5. **Power of Attorney:** Seller irrevocably appoints Buyer as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Buyer from Seller, or in the case of a violation by Seller of this Agreement or the occurrence of an Event of Default under Section 15 hereof by Seller, including without limitation:

    (i) to obtain and adjust insurance;

    (ii) to collect monies due or to become due under or in respect of any of the Future Receipts;

    (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above;

    (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors to direct payables to Buyer;

CHROME CAP

⊙ 03/13/2019 8:29 AM      14154847068      → 12062667010      pg 6 of 11

Case 2:19-bk-13989-WB Doc 605-17 Filed 02/19/20 Entered 02/19/20 16:30:41 Desc
Case 2:19-bk-13989-WB Document 17 Filed 02/19/20 Page 34 of 92 Page ID #:281
Main Document      Page 68 of 239
Page 4 of 16

(v) to file any claims or take any action or institute any proceeding which Buyer may deem necessary for the collection of any of the remaining Purchased Amount of the Future Receipts, or otherwise to enforce its rights with respect to delivery of the Purchased Amount; and/or

(vi) to contact any Processor of Seller and to direct such Processor(s) to deliver directly to Buyer all or any portion of the amounts received by such Processor(s) and to provide any information regarding Seller requested by Buyer. Each Processor may rely on the previous sentence as written authorization of Seller to provide any information requested by Buyer. Each Processor is hereby irrevocably authorized and directed by Seller to follow any instruction of Buyer without inquiry as to Buyer's right or authority to give such instructions. Seller acknowledges the terms of the preceding sentence and agrees not to:

(a) interfere with Buyer's instructions or a Processor's compliance with this Agreement or
(b) request any modification thereto without Buyer's prior written consent.

**6. Fees and Charges:** Other than the Origination Fee, if any, set forth above, Buyer is NOT CHARGING ANY ORIGINATION OR BROKER FEES to Seller. If Seller is charged another such fee, it is not being charged by Buyer. A list of all fees and charges applicable under this Agreement is contained in Appendix A.

**7. Credit Report and Other Authorizations:** Seller and each of the Owners signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its Owners, and (iii) to contact personal and business references provided by the Seller in the Application, at any time now or for so long as Seller and/or Owners continue to have any obligation owed to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

**8. Authorization to Contact Current and Prior Banks:** Seller hereby authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collections and in order to confirm that Seller is exclusively using the Account identified above, or any other account approved by Buyer, for the deposit of all business receipts.

**9. Financial Information:** Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will provide to Buyer any authorizations, bank or financial statements, tax returns, etc., as Buyer deems necessary in its sole discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

**10. Transactional History:** Seller authorizes all of its banks and brokers and Payment Card processors to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon an Event of Default.

**11. Publicity:** Seller hereby authorizes Buyer to use its name in listings of clients and in advertising and marketing materials.

**12. Application of Amounts Received by Buyer:** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

**13. Representations, Warranties and Covenants of Seller:**
- **13.1. Good Faith, Best Efforts and Due Diligence:** Seller will conduct its business in good faith and will use its best efforts to continue its business at least at its current level, to ensure that Buyer obtains the Purchased Amount.
- **13.2. Stacking Prohibited:** Seller shall not enter into any Seller cash advance or any loan agreement that relates to or involves its Future Receipts with any party other than Buyer for the duration of this Agreement. Buyer may share

CHROME CAP

information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

- 13.3. **Financial Condition and Financial Information:** Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly represent the financial condition of Seller at such dates, and Seller will notify Buyer immediately if there are material adverse changes, financial or otherwise, in the condition or operation of Seller or any change in the ownership of Seller. Buyer may request statements at any time during the performance of this Agreement and the Seller shall provide them to Buyer within five business days. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations. Seller further agrees to authorize the release of any past or future tax returns to Seller.

- 13.4. **Governmental Approvals:** Seller is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

- 13.5. **Authority to Enter into This Agreement:** Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

- 13.6. **Change of Name or Location or Sale or Closing of Business:** Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. Except as disclosed to Buyer in writing, Seller has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller agrees that until Buyer has received all of the Purchased Amount Seller will not voluntarily close its business on a temporarily basis for renovations, repairs, or any other purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer ten business days notice to the extent practicable.

- 13.7. **No Pending or Contemplated Bankruptcy:** As of the date Seller executes this Agreement, Seller is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under any Title of the United States Code and there has been no involuntary petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney within six months prior to the date of this Agreement. Seller further warrants that it does not anticipate filing a bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

- 13.8. **Seller to Maintain Insurance:** Seller will possess and maintain insurance in such amounts and against such risks as are necessary to protect its business and will provide proof of such insurance to Buyer upon demand.

- 13.9. **Seller to Pay Taxes Promptly:** Seller will promptly pay all necessary taxes, including but not limited to employment and sales and use taxes.

- 13.10. **No Violation of Prior Agreements:** Seller's execution and performance of this Agreement will not conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement the prohibits the sale or pledge of Seller's future receipts.

- 13.11. **No Diversion of Receipts:** Seller will not permit any event to occur that could cause a diversion of any of Seller's Future Receipts from the Account to any other entity.

- 13.12. **Seller's Knowledge and Representation:** Seller represents warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

## 14. Rights of Buyer:

- 14.1. **Financing Statements Financing Statements and Security Interest:** Seller grants Buyer a security interest in all of Seller's present and future accounts, chattel paper, deposit accounts, personal property, assets and fixtures, general intangibles, instruments, equipment, inventory wherever located, and proceeds now or hereafter owned or acquired by Seller. Seller authorizes Buyer to file one or more UCC-1 forms consistent with the Uniform Commercial Code ("UCC") in order to give notice of this security interest and that the Purchased Amount of Future Receipts is the sole property of Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit the Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

CHROME CAP

☉ 03/13/2019 8:29 AM     14154847068     → 12062667010     pg 8 of 11

Case 2:19-bk-02309-AWB   Doc 605-17   Filed 02/19/20   Entered 02/19/20 16:30:44   Desc
Main Document     Page 70 of 239     Page 6 of 16

**- 14.2. Right of Access:** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to:

(i) enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's daily receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, and

(ii) Seller shall provide access to its employees and records and all other items as requested by Buyer, and

(iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

**- 14.3. Phone Recordings and Contact:** Seller agrees that any call between Buyer and Seller, and their agents and employees may be recorded or monitored. Further, Seller agrees that

(i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions;

(ii) that such communications and contacts are not unsolicited or inconvenient; and

(iii) that any such contact may be made at any phone number, emails address, or facsimile number given to Buyer by the Seller, its agents or employees, including cellular telephones.

**15. Events of Default:** The occurrence of any of the following events shall constitute an "Event of Default":

(a) any act or omission by or on behalf of Seller that has the result of interfering with, or circumventing, the payment to Purchaser of the Purchased Amount, including without limitation, adding or changing processors without Buyer's prior written consent, conducting business under an alternative name, making use of any depository accounts other than the Account without Buyer's prior written consent, encouraging customers to avoid making card payments or other act that results in a material decrease in the monthly number of deposits made and/or processing batches deposited to the Account that is disproportionate to any changes in the Future Receivables, or manipulating the use and form of business entities for the purpose of avoiding Seller's obligations hereunder;

(b) Seller violates any representation, warranty, agreement, promise or covenant set forth in this Agreement;

(c) Seller applies for, or enters into, any other form of financing without the prior written consent of Buyer;

(d) Seller interferes with Buyer's access to electronic bank information for the Account;

(e) Seller defaults under any of the terms, covenants and conditions of any other agreement with Buyer; or

(f) Seller fails to provide timely notice to Buyer such that in any given calendar month there are two or more ACH transactions attempted by Buyer that are rejected by Seller's bank.

(g) Seller completes a transaction that results in a change of control of Seller's business;

(h) Seller becomes subject to any judgment, garnishment, or tax lien following the date of this Agreement;

(i) Seller has an event of default under any other material agreement or contract; or

(j) Seller fails to maintain an amount equal to twice the Daily Amount in the Account on any day during the term of this Agreement.

**16. Remedies:** If any Event of Default occurs, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

**- 16.1.** The Specified Percentage shall equal 100%. The full uncollected Purchased Amount plus all fees and charges (including legal fees) due under this Agreement will become due and payable in full immediately.

**- 16.2.** Buyer may enforce the provisions of the Personal Guaranty of Performance against each Owner.

**- 16.3.** Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover Judgment against Seller, Seller shall be liable for all of Buyer's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

CHROME CAP

**- 16.4.** This Agreement shall be deemed Seller's Assignment of Seller's Lease of Seller's business premises to Buyer. Upon an Event of Default, Buyer may exercise its rights under this Assignment of Lease without prior notice to Seller.

**- 16.5.** Buyer may debit Seller's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Seller's bank account or otherwise for all sums due to Buyer.

**- 16.6.** Seller shall pay to Buyer all reasonable costs associated with the Event of Default and the enforcement of Buyer's remedies, including but not limited to court costs and attorneys' fees.

**- 16.7.** Buyer may exercise and enforce its rights as a secured party under the UCC.

**- 16.8.** All rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**17.  Modifications Agreements:** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Buyer.

**18.  Assignment:** Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

**19.  Notices:**

**- 19.1. Notices from Buyer to Seller:** Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Buyer's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective upon mailing to Seller's address set forth in this Agreement.

**- 19.2. Notices from Seller to Buyer:** Seller may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller to Buyer must be delivered by certified mail, return receipt requested, to Buyer's address set forth in this Agreement. Notices sent to Buyer shall become effective only upon receipt by Buyer.

**20.  Binding Effect; Governing Law, Venue and Jurisdiction:** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Seller agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Buyer to transfer such proceeding to an Acceptable Forum.

**21.  Survival of Representation, etc:** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

**22.  Interpretation:** All Parties hereto have reviewed this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**23.  Entire Agreement and Severability:** This Agreement embodies the entire agreement between Seller and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**24.  Facsimile Acceptance:** Facsimile signatures hereon, or other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes.

**25.  Confidentiality:** The terms and conditions of this Agreement are proprietary and confidential unless required by law. Seller shall not disclose this information to anyone other than its attorney, accountant or similar service

CHROME CAP

provider and then only to the extent such person uses the information solely for purpose of advising Seller and first agrees in writing to be bound by the terms of this Section. A breach entitles Buyer to damages and legal fees as well as temporary restraining order and preliminary injunction without bond.

### 26. Monitoring, Recording, and Solicitations:

- **26.1. Authorization to Contact Seller by Phone:** Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

- **26.2. Authorization to Contact Seller by Other Means:** Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

**27. JURY WAIVER:** THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR IT'S ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**28. CLASS ACTION WAIVER:** THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT:

(I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND

(II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**29. ARBITRATION:** IF BUYER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). BUYER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND THE GUARANTOR MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA OR NAF RULES. SELLER AND THE GUARANTOR AGREE THAT, BY ENTERING INTO HIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY, BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S

CHROME CAP

CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OR A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID.

**30. RIGHT TO OPT OUT OF ARBITRATION:** SELLER AND GUARANTOR(S) MAY OPT OUT OF THIS CLAUSE. TO OPT OUT OF THIS ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THIS CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: BUYER – ARBITRATION OPT OUT, CHROME CAP, 366 NORTH BROADWAY, JERICHO, NY 11753, ATTENTION: LEGAL DEPARTMENT.

**31. Service of Process:** In addition to the methods of service allowed by the New York state civil practice law & rules ("CPLR"), seller hereby consents to service of process upon it by registered or certified mail, return receipt requested, service hereunder shall be complete upon seller's actual receipt of process or upon buyer's receipt of the return thereof by the united states postal service as refused or undeliverable. Seller must promptly notify buyer, in writing, of each and every change of address to which service of process can be made. Service by buyer to the last known address shall be sufficient, seller will have (30) calendar days after service hereunder is complete in which to respond. Furthermore, seller expressly consents that any and all notice(s), demand(s), request(s) or other communication(s) under and pursuant to this agreement for the purchase and sale of future receivables shall be delivered in accordance with the provisions of this agreement for the purchase and sale of future receivables.

ABT HOLDINGS, INC. / SCOOBEEZ, INC. / SCOOBEEZ GLOBAL INC / ABT MINING CO INC
Seller:_____

Agreed to by:_____                    (Signature)

its _____ (Title)

Guarantor:  SHAHAN OHANESSIAN   (Print Name) Signature:_____

Guarantor:_____ (Print Name) Signature:_____

CHROME CAP

Case 2:20-cv-03290-AB   Document 17-1   Filed 07/07/20   Page 65 of 96   Page ID #:6267

# EXHIBIT E



March 13, 2019

Amazon, Inc
Corporation Service Company
300 Deschutes Way SW, Suite 304
Tumwater, Washington 98501

To Whom It May Concern:

Please see the enclosed letter and supporting documents, requesting that a hold be placed on the following merchant's account and certain other documentation or information:

ABT HOLDINGS, INC., SCOOBEEZ, INC. DBA SCOOBEEZ, SCOOBEEZ GLOBAL INC. AND
ABT MINING CO INC   and SHAHAN OHANESSIAN
225 S Lake Ave #300
Pasadena, California 91101

Sincerely,

Steven Berkovitch Esq.
Berkovitch & Bouskila, PLLC
1330 6th Ave Suite 600B
New York, NY 10019
(212) 729-1477
Legal@BBLawpllc.com


**PLEASE RESPOND TO THIS LETTER VIA EMAIL OR FAX:**
**LEGAL@BBLAWPLLC.COM**
**347-342-3192**



March 13, 2019

Attention: Amazon, Inc
Corporation Service Company
300 Deschutes Way SW, Suite 304
Tumwater, Washington 98501

### UCC LIEN NOTICE AND NOTICE OF POWER OF ATTORNEY GRANTED BY MERCHANT TO GTR SOURCE, LLC GIVING GTR SOURCE, LLC POWER-OF-ATTORNEY OVER ACCOUNT RECEIVABLES OF MERCHANT

Re: ABT HOLDINGS, INC., SCOOBEEZ, INC. DBA SCOOBEEZ, SCOOBEEZ GLOBAL INC. AND ABT MINING CO INC  and SHAHAN OHANESSIAN

**Balance due to GTR Source, LLC: $1,491,072.00**

Dear Sir/Madam,

I represent GTR Source, LLC in the above matter. This notice is being sent pursuant to UCC 9-406; you have you have a balance owed to ABT Holdings, Inc., Scoobeez, Inc. dba Scoobeez, Scoobeez Global Inc. and ABT Mining CO Inc (the "Merchant"), located at 225 S Lake Ave #300 Pasadena, California 91101.

Pursuant to the enclosed Agreement, GTR Source, LLC purchased $1,823,750.00 of the Merchant's future accounts. The Agreement was structured so that GTR Source, LLC was to receive a portion of all the Merchant's deposits. In accordance with the Agreement, GTR Source, LLC filed a UCC-1 financing statement with the Secretary of State of California, thereby obtaining a perfected security interest in the Merchant's assets, including without limitation, the Merchant's accounts receivables. A copy of the UCC-1 is also enclosed herein for your reference.

The Merchant has breached the Agreement due to non-payment of the receivables and therefore is currently in default.

It has come to GTR Source, LLC's attention that you have a balance owed to the Merchant or have been holding funds for the Merchant.  This notice is to inform you that by not forwarding said funds to GTR Source, LLC is a violation of the UCC-1 filing and security interest, and hereby interfering with the Agreement entered into by and between the Merchant and GTR Source, LLC.

Please contact me with any questions.

Steven Berkovitch Esq.
Berkovitch & Bouskila, PLLC
1330 6th Ave Suite 600B
New York, NY 10019



(212) 729-1477
Service@BBLawPLLC.com

# iLien Cover Page

Date Printed: 02/15/2019

Debtor:
Scoobeez INC
640 Irving Ave
Glandale, CA  91201

bill code:
loan num:
REF3:
REF4:
Ref5:
Ref6:
Ref7:
Law Firm Bill Code:

iLien File #:  70720175
Order Confirmation #:  68532354

UserID:  270042
UserName:  STEVE REICH
Number of Collateral Pages Attached: 0

Transaction Type:  Original
Jurisdiction:  CA, Secretary of State

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

Lien Solutions
Representation of filing

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| Phone: (800) 331-3282 Fax: (818) 662-4141 |

**This filing is Completed**
File Number : 197697253443
File Date : 14-Feb-2019

| B. E-MAIL CONTACT AT FILER (optional) |
| CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)    44766 - GTR SOURCE

Lien Solutions        68532354
P.O. Box 29071
Glendale, CA 91209-9071        CALI

File with: Secretary of State, CA

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME |
| Scoobeez INC |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 640 Irving Ave | Glendale | CA | 91201 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME |
| Scoobeez Deliveries INC |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3463 Foothill Blvd | Glendale | CA | 91214-1856 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |
| GTR SOURCE LLC |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1006 MONMOUTH AVE | LAKEWOOD | NJ | 08701 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All accounts receivable, receipts, instruments, contract rights and other rights to receive the payment of money, patents, chattel paper,

licenses, leases and general intangibles, whether now owned or hereafter acquired or arising, and all of Debtor's books and

records relating to any of the foregoing.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative |
| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: |
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor |

8. OPTIONAL FILER REFERENCE DATA:
68532354

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    Exhibit A page 79

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDITIONAL PARTY
FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 18a. ORGANIZATION'S NAME |
|---|
| Scoobeez INC |

OR

| 18b. INDIVIDUAL'S SURNAME | | |
|---|---|---|
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ABT Holdings Inc | | | |

OR

| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 396 S Pasadena Ave | Pasadena | CA | 91105 | USA |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

22. ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

23. ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

24. MISCELLANEOUS: 68532354-CA-0   44766 - GTR SOURCE LLC        GTR SOURCE LLC        File with: Secretary of State, CA

Exhibit A - Page 80

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

Case 2:19-bk-14989-WB    Doc 605    Filed 02/19/20    Entered 02/19/20 11:27:11    Desc
Case 2:19-cv-05230-AB    Document 17-1    Filed 02/18/20    Page 72 of 96    Page ID #:824

Main Document    Page 81 of 239
Sales Partner:

# GTR SOURCE LLC

### MERCHANT AGREEMENT

Agreement dated 12/03/2018 _____ between GTR Source LLC ("GSL") and the Merchant listed below ("MERCHANT")

(Month)    (Day)    (Year)

### MERCHANT INFORMATION

Merchant's Legal Name: ABT HOLDINGS, INC. / SCOOBEEZ, INC. / SCOOBEEZ GLOBAL INC / ABT MINING CO INC

D/B/A: SCOOBEEZ _____ State of Incorporation / Organization: CA/CA ___ Federal Tax ID _____

Type of Entity (circle one)   Corporation   Limited Liability Company Limited Partnership   Limited Liability Partnership   Sole Proprietorship

Physical Address: 225 S Lake Ave #300 / 396 S PASADENA AVE. City: Pasadena/ Pasadena State: CA /CA Zip: 91101/91105

Contact Name: SHAHAN OHANESSIAN _____ Contact Number: _____ Email: _____

Mailing Address: 1328 DOVERWOOD DR _____ City: GLENDALE ____ State: CA ____ Zip: 91207

#### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant ("Merchant" or "Seller") hereby sells, assigns and transfers to GSL ("GSL" or "Buyer") (making GSL the absolute owner) in consideration of the funds provided ("Purchase   Price") specified below, all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business), for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to GSL.

The Purchased Amount shall be paid to GSL by Merchant's irrevocably directing and authorizing that there be only one depositing bank account, which account must be acceptable to, and pre-approved by, GSL (the "Account") into which Merchant and Merchant's customers shall remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each Transaction, until such time as GSL receives payment in full of the Purchased Amount. Merchant hereby authorizes GSL to ACH Debit the specified remittances   from the merchant's Account on a daily basis and will provide GSL with all required access codes, and monthly bank statements. Merchant understands that it is responsible for ensuring that  the specified percentage to be debited by GSL remains in the Account  and will be held responsible for any fees incurred by GSL resulting from a rejected ACH attempt or an event of  default. (See Appendix A) GSL is not responsible for any overdrafts or rejected transactions that may result from GSL's ACH debiting the specified amounts under the terms of this agreement. GSL will debit the specific daily amount each business day and upon receipt of the Merchant's monthly bank statements on or about the eighteenth day of each month reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the specified percentage. GSL may,  upon Merchant's request, adjust the amount of any payment due under this Agreement at GSL's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between GSL and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT  AGREEMENT  TERMS  AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

Total Purchase Price: 1,250,000.00 Specified Percentage: 10 % Estimated Daily Amount:$ 12,999.00 Total Purchased Amount:$ 1,823,750.00

THE MERCHANT AGREEMENT TERMS AND CONDITIONS SET FORTH ON PAGE 2, THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.

FOR THE MERCHANT (#1)

By SHAHAN OHANESSIAN _____
(Print Name and Title) _____ (Signature) _____ **Sign Here**

FOR THE MERCHANT (#2)

By _____
(Print Name and Title) _____ (Signature) _____ **Sign Here**

OWNER#1

By SHAHAN OHANESSIAN _____
(Print Name) _____ (Signature) _____ **Sign Here**

OWNER #2

By _____
(Print Name) _____ (Signature) _____ **Sign Here**

GTR SOURCE LLC _____

By _____ _____ Sales Associate Name: _____
(Company Officer) _____ (Signature)

GTR Source LLC |111 John Street Suite 1210 | New York |NY 10038| Ph. (855) 662-9303 Fax (855) 204-0222

# MERCHANT AGREEMENT TERMS AND CONDITIONS

### I. TERMS OF ENROLLMENT PROGRAM

1.1 **Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to GSL and appoint a Bank acceptable to GSL, to obtain electronic fund transfer services and/or "ACH" payments. Merchant shall provide CMS and/or its authorized agent with all of the information, authorizations and passwords necessary to verify Merchant's receivables, receipts and deposits into the account. Merchant shall authorize GSL and/or its agent to deduct amounts owed to GSL for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant from electronic check transactions and to pay such amounts to GSL by permitting GSL to withdraw the specified percentages by ACH debiting of the account. The authorization shall be irrevocable absent GSL's written consent.

1.2 **Future Purchases.** GSL reserves the right to rescind the offer to make any purchase payments hereunder, in its sole discretion.

1.3 **Financial Condition.** Merchant and Guarantor(s) authorize GSL and its agents to investigate their financial responsibility and history, and will provide to GSL any bank or financial statements, tax returns, etc. as GSL deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information GSL is authorized to update such information and financial profiles from time to time as it deems appropriate.

1.4 **Transactional History.** Merchant authorizes GSL and its agents to investigate their financial responsibility and history, and will provide to GSL any authorizations, bank or financial statements, tax returns, etc., as GSL deems necessary in its sole and absolute discretion prior to any time after the execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. Merchant waives, to the maximum extent permitted by law, any claims for damages against GSL or any of its affiliates relating to any investigation undertaken by or on behalf of GSL as permitted by this Agreement or disclosure of information as permitted by this Agreement.

1.5 **Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by GSL for monies owed to GSL from Merchant and (b) actions taken by Processor in reliance upon information or instructions provided by GSL.

1.6 **No Liability.** In no event will GSL be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of GSL's legal fees and expenses resulting therefrom.

1.7 **Reliance on Terms.** Sections 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, GSL and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

1.8 **Sale of Receipts.** (**THIS IS NOT A LOAN**) Merchant is selling a portion of a future revenue stream to GSL at a discount, not borrowing money from GSL. There is no interest rate or payment schedule and not time period during which the Purchased Amount must be collected by GSL. If Future Receipts are remitted more slowly than GSL may have anticipated or projected because Merchant's business has slowed down, or if the full Purchased Amount is never remitted because Merchant's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Merchant has not breached this Agreement, Merchant would not owe anything to GSL and would not be in breach of or default under this Agreement. GSL is buying the Purchased Amount of Future Receipts knowing the risks that Merchant's business may slow down or fail, and GSL assumes these risks based on Merchant's representations, warranties, and covenants in this Agreement. Merchant transfers to GSL full and complete ownership of the Purchased Amount of Future Receipts and Merchant retains no legal or equitable interest therein. Merchant agrees that it will treat Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that GSL is entitled to audit Merchant's accounting records upon reasonable Notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts.

1.9 **Power of Attorney.** Merchant irrevocably appoints GSL as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to GSL from Processor, or in the case of a violation by Merchant of Section 1.2 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation: (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (ii) to receive, endorse, and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to deliver future receipts directly to GSL' and (v) to file any claims or take any action or institute any proceeding which GSL may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to the delivery of the Purchased Amount.

1.10 **Protections against Default.** The following Protections 1 through 8 may be invoked by GSL, immediately and without notice to Merchant in an event of default, as prescribed by Section 3.1 and/or 2.9, OR in the event that: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the GSL electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse to GSL; (c) Merchant changes the electronic check processor through which the Receipts are settled from Process or to

another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check transactions to another processor; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God) transfers, moves, sells, disposes, transfers or otherwise conveys its business or assets without (i) the express prior written consent of GSL, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to GSL; (e) Merchant demonstrates an intent to default on this agreement by threatening to either cease payments or default on any provision within this Agreement; or (f) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise— the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than checks that are settled through Processor. These protections are in addition to any other remedies available to GSL at law, in equity or otherwise pursuant to this Agreement. **Protection 1.** The full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately. **Protection 2.** GSL may enforce the provisions of the Personal Guarantee of Performance against the Guarantor(s). **Protection 3.** Merchant shall, upon execution of this Agreement, deliver to GSL an executed Confession of Judgment in favor of GSL in the amount of the Purchase Amount stated in the Agreement along with legal fees calculated at twenty five percent (25%) of the purchased price less any payments made and interest. Upon breach of any provision in paragraphs 1.10, 2.9, and/or 3.1, GSL may enter that Confession of Judgment as a judgment with the Clerk of the Court and execute thereon. **Protection 4.** GSL may enforce its security interest in the Collateral identified in the Security Agreement herein. **Protection 5.** GSL may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, in which GSL shall recover judgment against Merchant, Merchant shall be liable for all of GSL's costs of lawsuit, including but not limited to all reasonable attorneys' fees and court costs. **Protection 6.** Merchant shall, upon execution of this Agreement, deliver to GSL an executed assignment of lease of Merchant's premises in favor of GSL. Upon breach of any provision in this paragraph 1.12, GSL may exercise its rights under such assignment of lease. **Protection 7.** GSL may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise, in an amount consistent with the Specified Percentage. **Protection 8.** GSL shall have the right, without waiving any of its rights and remedies and without notice to Merchant and/or Guarantor(s), to notify Merchant's credit card processor of the sale of Receipts hereunder and to direct such credit card processor to make payment to GSL of all or any portion of the amounts received by such credit card processor on behalf of Merchant. Merchant hereby grants to GSL an irrevocable power - of-attorney, which power-of-attorney shall be coupled with an interest, and hereby appoints GSL or any of GSL's representatives as Merchant's attorney-in -fact, to take any and all action necessary to direct such new or additional credit card processor to make payment to GSL as contemplated by this Section.

1.11 **Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner, in respect of himself or herself personally, authorizes GSL to disclose information concerning Merchant's and each Owner's and/or Guarantor(s)'s credit standing and business conduct only, to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant, Guarantor(s) and Owner(s) hereby waives to the maximum extent permitted by law any claim for damages against GSL or any of its affiliates relating to any (1) investigation undertaken by or on behalf GSL as permitted by this Agreement and/or (ii) disclosure of information as permitted by this Agreement.

1.12 **Confidentiality.** The terms and conditions of this Agreement are proprietary and confidential unless required by law. Merchant shall not disclose this information to anyone other than its attorney, accountant, or similar service provider and then only to the extent such person uses the information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Action. A breach entitles GSL to damages and legal fees as well as temporary restraining order and preliminary injunction without bond.

1.13 **D/B/As.** Merchant hereby acknowledges and agrees that GSL may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between GSL and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

## II. REPRESENTATIONS, WARRANTIES, AND COVENANTS

Merchant represents, warrants, and covenants that as of this date and during the term of this Agreement:

2.1 **Financial Condition and Financial Information.** Any bank statements and financial statements of Merchant that have been furnished to GSL, and future statements that will be furnished to GSL, fairly represent the financial condition of Merchant at such dates, and Merchant will notify GSL immediately if there are material adverse changes, financial or otherwise, in the condition or operation of the Merchant or any change in the ownership of the Merchant. GSL may request statements at any time during the performance of this Agreement and the Merchant shall provide them to GSL within five business days. Furthermore, Merchant represents that all documents, forms and recorded interviews provided to or with GSL are true, accurate and complete in all respects, and accurately reflect Merchant's financial condition and results of operations. Merchant further agrees to authorize the release of any past or future tax returns to Merchant.

2.2 **Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate and lease its properties and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engages and/or will engage hereafter.

2.3 **Authorization.** Merchant and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4 **Insurance.** Merchant will maintain business-interruption insurance naming GSL as a loss payee and additional insured in amounts and against risks as are satisfactory to GSL and shall provide GSL with proof of such insurance upon request.

2.5 **Electronic Check Processing Agreement.** Merchant will not change its processor, add terminals, change its financial institution or bank account(s) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without GSL's prior written consent. Any such changes shall be a material breach of this Agreement.

2.6 **Change of Name and/or Location or the Sale and/or Closing of the Business.** Merchant will not conduct Merchant's business under any name other than as disclosed to GSL or change any of its places of business without prior written consent of GSL. Merchant will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of GSL, and (ii) the written agreement of any purchaser or transferee assuming all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to GSL. Except as disclosed to GSL in writing, Merchant has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Merchant agrees that until GSL has received all of the Purchases Amount Merchant will not voluntarily close its business on a temporary basis for renovations, repairs or other purposes. This

provision, however, does not prohibit Merchant from closing its business temporarily if such closing is require to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Merchant. Prior to any such closure, Merchant will provide GSL ten days' notice to the extent practicable.

2.7 **Estoppel Certificate**. Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from GSL to Merchant, execute, acknowledge and deliver to GSL and/or to any other person, firm or corporation specified by GSL, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modification, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been paid.

2.8 **No Pending or Contemplated Bankruptcy**. As of the date Merchant executes this Agreement, Merchant is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant represents that it has not consulted with a bankruptcy attorney within six months prior to the date of this Agreement. Merchant further warrants that it does not anticipate filing a bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

2.9 **Working Capital Funding**. Merchant shall not further encumber the Receipts without (i) the written consent of GSL, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to GSL; or (c) Merchant takes any action, fails to take any action, or offers any incentive— economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than checks that are settled through Processor. These protections are in addition to any other remedies available to GSL at law, in equity or otherwise pursuant to this Agreement. **Protection 1.** The full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately. **Protection 2.** GSL may enforce the provisions of the Personal Guarantee of Performance against the Guarantor(s). **Protection 3.** Merchant shall, upon whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales, with any party other than GSL. **Protection 4.** Merchant shall, upon execution of this Agreement, deliver to GSL an executed Confession of Judgment in favor of GSL in the amount of the Purchase Amount stated in the Agreement along with legal fees calculated at twenty five percent (25%) of the purchased price less any payments made and interest. Upon breach of any provision in paragraphs 1.10, 2.9, and/or 3.1, GSL may enter that Confession of Judgment as a judgment with the Clerk of the Court and execute thereon.

2.10 **Unencumbered Receipts**. Merchant has good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of GSL.

2.11 **Business Purpose**. Merchant is a valid business in good standing under the laws of the jurisdiction in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and *not as a consumer for personal, family or household purposes*.

2.12 **No Violation of Prior Agreements**. Merchant's execution and performance of this Agreement will not conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Merchant is subject, including any agreement that prohibits the sale or pledge of Merchant's future receipts.

### III. EVENTS OF DEFAULT AND REMEDIES

3.1 **Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material aspect when made; (c) the sending of notice of termination by Guarantor(s) prior to the Purchased Amount being paid to GSL; (d) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (e) Merchant shall transfer or sell all or substantially all of its assets; (f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (g) Merchant shall use multiple depository accounts without the prior written consent of GSL; (h) Merchant shall change its depositing account without the prior written consent of GSL; (i) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; (j) Merchant shall default under any of the terms, covenants and conditions of either this Agreement any other agreement with GSL.; or (k) Merchant shall fail to deposit its Receipts into the Account.

3.2 **Remedies**. In case of any Event of Default occurs and to Section 4.4 hereof, GSL may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy. All rights, powers and remedies of GSL in connection with this Agreement may be exercised at any time by GSL after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.3 **Costs**. Merchant shall pay to GSL all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and (b) the enforcement of GSL's remedies set forth herein, including but not limited to court costs and attorneys' fees.

3.4 **Required Notifications**. Merchant is required to give GSL written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give GSL seven (7) days written notice prior to closing of any sale or all or substantially all of the Merchant's assets or stocks.

### IV. MISCELLANEOUS

4.1 **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

4.2 **Assignment**. GSL may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part without prior notices to Merchant.

4.3 **Notices**. All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective ONLY upon receipt.

4.4 **Waiver Remedies**. No failure on the part of GSL to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.5 **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of GSL which consent may be withheld in GSL's sole discretion.

4.6 **Governing Law, Venue and Jurisdiction.** This Agreement shall be governed by and construed exclusively in accordance with the laws of the state of New York, without regards to any applicable principles of conflicts of law. If there is any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof or in any dispute arising among the parties, then such litigation shall only be instituted in any court sitting in New York State (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, and submit to the jurisdiction of the Acceptable Forums and waive any and application made by either party to transfer such proceeding to an Acceptable Forum.

4.7 **Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.8 **Entire Agreement and Severability.** This Agreement embodies the entire agreement between Merchant and GSL and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of any other provision contained herein shall not in any way be affected or impaired.

4.9 **JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY, AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

4.10 **CLASS ACTION WAIVER. THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

4.11 **Facsimile Acceptance.** Facsimile signature hereon, or other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes.

## GTR SOURCE LLC - SECURITY AGREEMENT AND GUARANTY

Merchant's Legal Name: AB1 HOLDINGS, INC. / SCOOBEEZ, INC. / SCOOBEEZ GLOBAL INC / ABT MINING CO  D/B/A: **SCOOBEEZ**

Physical Address: 225 S Lake Ave #300 / 355 S PASADENA AVE.        City: Pasadena/ Pasadena        State: CA /CA        Zip: 91101/91105

Federal ID#: _____

### SECURITY AGREEMENT

**Security Interest.**    This Agreement will constitute a security agreement under the Uniform Commercial Code.    Merchant grants to GSL a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant, (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to GSL under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to GSL upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover GSL's entitlements under this Agreement, GSL is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of GSL's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, GSL or an affiliate of GSL. GSL is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by GSL without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, GSL has control over and may direct the disposition of the Secured Assets, without further consent of Merchant, Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, GSL will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity.  Merchant will obtain from GSL  written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant agrees that this is a contract of recoupment and GSL is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant agrees not to contest or object to any motion for relief from the automatic stay filed by GSL.  Merchant agrees to execute and deliver to GSL such instruments and documents GSL may reasonably  request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. GSL is authorized to execute all such instruments and documents in Merchant's name.

**Additional-Collateral.**   To secure Guarantor's payment and performance obligations to GSL under the Guaranty, the Guarantor hereby grants GSL a security interest    in

_____(the
"Additional Collateral"). Guarantor understands that GSL will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Merchant and Guarantor each acknowledge and agree that any security interest granted to GSL under any other agreement between Merchant or Guarantor and GSL (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as GSL deems necessary to perfect or maintain GSL's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes GSL to file any financing statements deemed necessary by GSL to perfect or maintain GSL's security interest, which financing statement may contain notification that Merchant and/or Guarantor have granted a negative pledge to GSL with respect to the Collateral, and the Additional Collateral, and that any subsequent lienor may be tortuously interfering with GSL's rights. Merchant and Guarantor shall be liable for, and GSL may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by GSL in protecting, preserving and enforcing GSL's security interest and rights.

**Negative Pledge.** Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** GSL shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, GSL may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that GSL may enter into an agreement with Merchant's landlord giving GSL the right: (a) to  enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default, GSL may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to GSL, whether by acceleration or otherwise.

### GUARANTY

**Personal Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to GSL, Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the Merchant Agreement in Sections thereof 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13 and 2.14, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, GSL may seek recovery from Guarantors for all of GSL's losses and damages by enforcement of GSL's  rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral GSL may hold pursuant to this Agreement or any other guaranty.

GSL does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified  of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) GSL's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to GSL. In addition, GSL may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to GSL; (ii) release Merchant from its obligations to GSL; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to GSL under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that

GSL must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law. Guarantor's obligations under this Agreement shall include that amount.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.**

**MERCHANT #1**

By SHAHAN OHANESSIAN
     (Print Name and Title)
SS# _____

Drivers License Number _____ (Signature)

[Sign Here]

**MERCHANT #2**

By _____
     (Print Name and Title)
SS# _____

Drivers License Number _____ (Signature)

[Sign Here]

**OWNER/GUARANTOR #1**

SHAHAN OHANESSIAN
     (Print Name)
SS# _____

Drivers License Number _____ (Signature)

[Sign Here]

**OWNER/GUARANTOR #2**

_____
     (Print Name)
SS# _____

Drivers License Number _____ (Signature)

[Sign Here]

To the extent set forth herein, each of the parties is obligated upon his, her or its execution of the Agreement to all terms of the Agreement, including the Additional Terms set forth below. Each of above-signed Merchant and Owner(s) represent that he or she is authorized to sign this Agreement for Merchant, legally binding said Merchant to repay this obligation and that the information provided herein and in all of GSL documents, forms and recorded interviews is true, accurate and complete in all respects. If any such information is false or misleading, Merchant shall be deemed in material breach of all agreements between Merchant and GSL, and GSL shall be entitled to all remedies available under law, equity and/or this Agreement. GSL may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant via Processor and/or Operator to GSL. An investigative or consumer report may be made in connection with the Agreement. Merchant and each of the above-signed Owners authorizes GSL, its agents and representatives and any credit reporting agency engaged by GSL, to (i) investigate any references given or any other statements or data obtained from or about Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as Merchant and/or Owners(s) continue to have any obligation owed to GSL as a consequence of this Agreement or for GSL's ability to determine Merchant's eligibility to enter into any future agreement with Company. ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD, INTENTIONAL MISREPRESENTATION AND/OR UNJUST ENRICHMENT IN WHICH EVENT PCRV WILL BE ENTITLED TO THE RECOVERY OF NOT ONLY ITS LOSSES BUT ALSO PUNITIVE DAMAGES AND ALL OF ITS COSTS AND EXPENSES AND ITS REASONABLE LEGAL FEES.

**GTR Source LLC |111 John Street, Ste 1210 | New York |NY 10038| Ph. (855) 662-9303 Fax (855) 204-0222**





US POSTAGE & FEES PAID
PRIORITY MAIL
FLAT-RATE ENVELOPE
ComPlsPrice

062S0009657739
9491468
FROM 10019

stamps
endicia
03/14/2019

# PRIORITY MAIL 2-DAY™

Berkovitch & Bouskila PLLC
1330 Avenue of The Americas Suite 600B
New York NY 10019

**0006**

C017

SHIP
TO:

ATTN LEGAL
CORPORATION SERVICE COMPANY
AMAZON, INC
300 DESCHUTES WAY SW SUITE 304
Tumwater WA 98501-7719

## USPS TRACKING #



**9405 5116 9900 0527 4775 62**



US POSTAGE & FEES PAID
PRIORITY MAIL
FLAT-RATE ENVELOPE
ComPlsPrice

9491468
FROM 10019

stamps
endicia
03/14/2019

# PRIORITY MAIL 2-DAY™

Berkovitch & Bouskila PLLC
1330 Avenue of The Americas Suite 600B
New York NY 10019

**0006**

C017

SHIP
TO:
ATTN LEGAL
CORPORATION SERVICE COMPANY
AMAZON, INC
300 DESCHUTES WAY SW SUITE 304
Tumwater WA 98501-7719

## USPS TRACKING #





PS00001036014

EP14W Sept 2014
OD: 12.5 x 9.5

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE



This envelope is made from post-consumer waste. Please recycle - again.

# EXHIBIT F

# Law Office of Jason Gang, PLLC

1245 Hewlett Plaza, #478 • Hewlett, NY 11557

Phone:(646) 389-5610

March 20, 2019

Attention:

Please see the enclosed letter and supporting documents, requesting that a hold be placed on the following merchant's accounts receivable:

Scoobeez, Inc. / ABT Mining Co. Inc d/b/a Scoobeez / ABT Mining Co. and Shahan Ohanessian
396 S Pasadena Avenue, Pasadena, CA 911105

The original documents will follow via mail.

Sincerely,

Jason Gang Esq.
1245 Hewlett Plaza,
#478
Hewlett, NY 11557
Phone: (646) 389-5610
Email:
jason@jasongang.com

# LAW OFFICE OF Jason Gang, PLLC

1245 Hewlett Plaza, #478 • Hewlett, NY 11557

PHONE:(646) 389-5610

___

**VIA FACSIMILE:**
**& FIRST –CLASS MAIL**

Amazon.com Services, Inc.
c/o Corporation Service Company
80 State Street, 6th Floor
Albany, NY 12207-2543

## UCC LIEN NOTICE AND NOTICE OF POWER OF ATTORNEY GRANTED BY MERCHANT TO HOP CAPITAL GIVING HOP CAPITAL POWER-OF-ATTORNEY <u>OVER ACCOUNT</u> <u>RECEIVABLES OF MERCHANT</u>

Re: Scoobeez, Inc. / ABT Mining Co. Inc d/b/a Scoobeez / ABT Mining Co. and Shahan Ohanessian

**EIN:** ▮▮▮▮▮▮
**SSN:** ▮▮▮▮▮▮

### <u>Balance due to HOP Capital: $1,005,606.99</u>

Dear Sir/Madam

I represent HOP Capital ("HOP Capital") in the above matter. This notice is being sent pursuant to UCC 9-406; you may have a balance owed to Scoobeez, Inc. / ABT Mining Co. Inc d/b/a Scoobeez / ABT Mining Co. and Shahan Ohanessian (the "Merchant"), located at 396 S Pasadena Avenue, Pasadena, CA 911105.

Pursuant to the enclosed Agreement, HOP Capital purchased $877,500.00 of the Merchant's future accounts. The Agreement was structured so that HOP Capital was to receive 10% of all the Merchasnt's deposits. In accordance with the Agreement, HOP Capital filed a UCC-1 financing statement with the Secretary of State of CA, thereby obtaining a perfected security interest in the Merchant's assets, including without limitation, the Merchant's accounts receivables. A copy of the UCC-1 is also enclosed herein for your reference.

The Merchant has breached the Agreement due to non-payment of the receivables and therefore is currently in default.

It has come to HOP Capital's attention that you may have a balance owed to the Merchant or have been holding funds for the Merchant. This notice is to inform you that not forwarding said funds to HOP Capital is a violation of the UCC-1 filing and security interest, and hereby interfering with the Agreement entered into by and between the Merchant and HOP Capital.

Please direct all funds owed by you on behalf of the Merchant, or collected by you on behalf of the Merchant to this firm until the amount **$1,005,606.99** accrues. The UCC-1 puts all parties on notice of HOP Capital's rights to the Merchant's assets as a secured party.

In addition, pursuant to the Agreement, the Merchant granted to HOP Capital a limited power-of-attorney with respect to the Merchant's account debtors and credit-card processing, which can be found in paragraph 1.10 of the Agreement titled "Power of Attorney", a copy of which is both enclosed herein for reference and which states as follows:

# LAW OFFICE OF Jason Gang, PLLC

1245 Hewlett Plaza, #478 • Hewlett, NY 11557

PHONE:(646) 389-5610

---

1.11 Power of Attorney. Merchant irrevocably appoints AFS as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to AFS from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to AFS; and (v) to file any claims or take any action or institute any proceeding which AFS may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

Please contact me with any questions.

Jason Gang Esq.
1245 Hewlett Plaza,
#478
Hewlett, NY 11557
Phone: (646) 389-5610
Email:
jason@jasongang.com

# iLien Cover Page

Date Printed: 02/25/2019

Debtor:
SCOOBEEZ
396 S. PASADENA AVENUE
PASADENA, CA  91105

Syndicate Account #:  2
Client Business Name:  SCOOBEEZ, INC.
REF3:
REF4:
Ref5:
Ref6:
Ref7:
Law Firm Bill Code:

iLien File #:  70817764
Order Confirmation #:  68677594

UserID:  254726
UserName:  Binie Borenstein
Number of Collateral Pages Attached:  0

Transaction Type:  Original
Jurisdiction:  CA, Secretary of State

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**Lien Solutions**
Representation of filing

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |
| Phone: (800) 331-3282 Fax: (818) 662-4141 |

**This filing is Completed**
File Number : 197698978307
File Date : 25-Feb-2019

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |
| CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com |

| C. SEND ACKNOWLEDGMENT TO: (Name and Address)   36303 - EMPIRE |
| --- |

Lien Solutions          68677594
P.O. Box 29071
Glendale, CA  91209-9071      CALI

File with: Secretary of State, CA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| SCOOBEEZ | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 396 S. PASADENA AVENUE | PASADENA | CA | 91105 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| ABT MINING CO. INC. | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 396 S. PASADENA AVENUE | PASADENA | CA | 91105 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| HOP CAPITAL | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 323 SUNNY ISLES BLVD #501 | SUNNY ISLES BEACH | FL | 33160 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All Assets now owned or hereafter acquired and wherever located, including but not limited to, the following subcategories of assets:
a. Accounts, including but not limited to, credit card receivables; b. Chattel Paper; c. Inventory; d. Equipment; e. Instruments, including but not limited to,
Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts; i. Letter of Credits Rights; j. General Intangibles; k. Supporting
Obligations; and l. Proceeds and Products of the foregoing.
NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS
AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN, THE FURTHER ENCUMBERING OF WHICH MAY
CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCE IN THE EVENT THAT ANY
ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE
ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)  ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | | | 6b. Check only if applicable and check only one box: | |
| --- | --- | --- | --- | --- |
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
68677594                          2                                                    SCOOBEEZ, INC.

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDITIONAL PARTY
FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

| 18a. ORGANIZATION'S NAME |
|---|
| SCOOBEEZ |

OR

| 18b. INDIVIDUAL'S SURNAME |
|---|
| |

| FIRST PERSONAL NAME |
|---|
| |

| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|
| | |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| OHANESSIAN | SHAHAN | | |
| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1328 DOVERWOOD | GLENDALE | CA | 91207 | USA |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |
| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |
| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

22. ☐ ADDITIONAL SECURED PARTY'S NAME    or    ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |
| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

23. ☐ ADDITIONAL SECURED PARTY'S NAME    or    ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |
| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

24. MISCELLANEOUS: 68677594-CA-0   36303 - EMPIRE FUNDING        HOP CAPITAL        File with: Secretary of State, CA      2  SCOOBEEZ, INC.

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDITIONAL PARTY (Form UCC1AP) (Rev. 08/22/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

HOP CAPITAL

## SECURED MERCHANT AGREEMENT

Agreement dated 09/11/2018 _____ between Hop Capital ("HC") and the merchant listed below ("the Merchant").

Merchant's Legal Name: SCOOBEEZ, INC./ ABT MINING CO. INC

D/B/A: SCOOBEEZ/ ABOY MINING CO.

Physical Address: 3860 S PASADENA AVENUE

City: PASADENA     State: CA     Zip: 91106

☐ Same as Physical Address

Mailing Address: 1328 DOVERWOOD DR

City: GLENDALE     State: CA     Zip: 91207

Type of Entity (check one): ☑ Corporation ☐ Limited Liability Company ☐ Limited Liability Partnership ☐ Limited Partnership ☐ Sole Proprietor

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to HC (making HC the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts" defined as all payments made by cash, check, credit or debit card, electronic transfer or other form or monetary payment in the ordinary course of the merchant's business), for the payment of Merchant's sale of goods or services until such amounts specified below (the "Purchased Amount") has been delivered by Merchant to HC. The Purchased Amount shall be paid to HC by Merchant's irrevocably authorizing only one depositing account acceptable to HC (the "Account") to remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each transaction, until such time as HC receives payment in full of the Purchased Amount. Merchant hereby authorizes HC to ACH Debit the specified remittances from the merchant's bank account on a daily basis and will process HC with all required access codes, and monthly bank statements. Merchant understands that it is responsible for ensuring that the specified percentage to be debited by HC remains in the account and will be held responsible for any fees incurred by HC resulting from a rejected ACH attempt or an event of default. (See Appendix A).

HC is not responsible for any overdrafts or rejected transactions that may result from HC's debiting the specified amounts under the terms of this agreement. HC will either (i) debit the Specified Percentage on a daily basis, or (ii) if a Specific Daily Amount is specified hereunder, then HC shall debit the specific Daily Amount on each business day, and upon the Merchant's request and receipt of the Merchant's monthly bank statements, HC shall on or about the eighteenth day of each month reconcile the Merchant's account by either crediting or debiting the difference between because the amount debited and the Specified Percentage, from or back to the Merchant's bank account so that the amount debited each month equals the Specified Percentage. HC may, upon Merchant's request, adjust the amount of any payment due under this Agreement to HC's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between HC and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS in the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all terms applicable under this agreement is provided herein in Appendix A.

PURCHASE PRICE: $650,000.00     SPECIFIED PERCENTAGE: 10%     RECEIPTS PURCHASED AMOUNT: $877,500.00

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH ON PAGE 2, THE "MERCHANT SECURITY AGREEMENT", AND ADMINISTRATIVE FORM", HEREOF ARE HEREBY INCORPORATED HEREIN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

MERCHANT #1 (Print Name)

By: First Name SHAHAN     Last Name OHANESSIAN

Title: PRESIDENT

MERCHANT #2 (Print Name)

By: First Name _____ Last Name _____

Title: _____

OWNER/GUARANTOR #1 (Print Name)

By: First Name SHAHAN     Last Name OHANESSIAN

Title: PRESIDENT

OWNER/GUARANTOR #2 (Print Name)

By: First Name _____ Last Name _____

Title: _____

HOP CAPITAL

By (Company Officer): _____     Sales Associate Name (Signature): _____

To the extent set forth herein, each of the parties obligated agrees to, he or its execution of the Agreement to all terms of the Agreement, including the Additional Terms set forth below. Each of above-signed Merchant and Owner(s) represents that he or she is authorized to sign this Agreement for Merchant, legally binding said Merchant to repay this obligation and that the information provided herein and in all of HC documents, forms and related in all respects and complete in all respects. If any such information is false or misleading, Merchant shall be deemed in material breach of all agreements between Merchant and HC and HC shall be entitled in all remedies available under law. HC may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant via Payment and/or Operator to HC. An investigative report may be made in connection with the Agreement. Merchant and each of the above-signed Owners authorizes HC, its agents and representatives and any credit-reporting agency engaged by HC, to (i) investigate any references given or any other statements or data obtained from or about Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report of any time now or for so long as Merchant and/or Owner(s) continue to have any obligation owed to HC as a consequence of this Agreement or for HC's ability to determine Merchant's eligibility to enter into any future agreement with Company.

**ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.**

MERCHANT AGREEMENT TERMS AND CONDITIONS
Case 2:20-bk-14989-WB   Doc 605   Filed 02/10/20   Entered 02/10/20 16:30:44   Desc
Main Document   Page 99 of 286

## I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to HC, and appoint a Bank acceptable to HC, to obtain electronic fund transfer services and/or "ACH" payments. Merchant shall provide HC and/or its authorized agent with all of the information, authorizations and passwords necessary to verify Merchant's receivables, receipts and deposits into the account. Merchant shall authorize HC and/or it's agent to deduct the amounts owed to HC for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant from electronic check transactions and to pay such amounts to HC by permitting HC to withdraw the specified percentages by ACH debiting of the account. The authorization shall be irrevocable absent HC's written consent.

**1.2 Term of Agreement.** This Agreement shall have a term of one year. Upon the expiration of the term, this Agreement shall automatically renew for successive one-year terms, provided, however, that during the renewal term(s) Merchant may terminate this Agreement upon ninety days' prior written notice [effective upon receipt] to HC, however, said termination of this Agreement shall not affect Merchant's responsibility to satisfy all outstanding obligations to HC at the time of termination. Notwithstanding the foregoing, should Merchant elect to terminate this Agreement in accordance with this paragraph "1.2" herein, but Merchant shall fail to fully satisfy its obligation to HC, then Merchant's termination shall have no effect, and this Agreement shall remain in full force and effect.

**1.3 Future Purchases.** HC reserves the right to rescind the offer to make any purchase payments hereunder, in its sole discretion.

**1.4 Financial Condition.** Merchant and Guarantor(s) authorize HC and its agents to investigate their financial responsibility and history, and will provide to HC any bank or financial statements, tax returns, etc., as HC deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. HC is authorized to update such information and financial profiles from time to time as it deems appropriate.

**1.5 Transactional History.** Merchant authorizes their bank to provide HC with Merchant's banking and/or credit-card processing history to determine qualification or continuation on this program.

**1.6 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by HC for monies owed to HC from Merchant and (b) actions taken by Processor in reliance upon information or instructions provided by HC.

**1.7 No-Liability.** In no event will HC be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and Guarantor(s).

**1.8 Reliance on Terms.** Section 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, HC and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.9 Sale of Receipts.** Merchant and HC agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from HC to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement equals the fair market value of such Receipts. HC has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to HC in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts be deemed as interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that HC has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and HC shall promptly refund to Merchant any interest received by HC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that HC not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law.

**1.10 Power of Attorney.** Merchant irrevocably appoints HC as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to HC from Processor, or in the case of a violation by Merchant of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection

or otherwise, effecting customers or account debtors to make payment directly to HC; and (v) to file any claims or take any action or institute any proceeding which HC may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

**1.11 Protections Against Default.** The following Protections 1 through 8 may be invoked by HC, immediately and without notice to erchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without stamming into the HC electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse to HC; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check transactions to another processor; (d) Merchant interrupts the operation of this business [other than adverse weather, natural disasters or acts of God] transfers, moves, sells, disposes, transfers or otherwise conveys its business or assets without (i) the express prior written consent of HC, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to HC; or (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than checks that are settled through Processor. These protections are in addition to any other remedies available to HC at law, in equity or otherwise pursuant to this Agreement. Protection 1: The full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately. Protection 2. HC may enforce the provisions of the Personal Guarantee of Performance against the Guarantor(s). Protection 3. Merchant shall, upon execution of this Agreement, deliver to HC an executed confession of judgment in favor of HC in the amount of the Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, HC may enter that confession of judgment as a judgment with the Clerk of the Court and execute thereon. Protection 4. HC may enforce its security interest in the Collateral identified in the Security Agreement herein. Protection 5. HC may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, in which HC shall recover judgment against Merchant, Merchant shall be liable for all of HC's costs of lawsuit, including but not limited to all reasonable attorneys' fees and court costs. Protection 6. Merchant shall, upon execution of this Agreement, deliver to HC an executed assignment of lease of Merchant's premises in favor of HC. Upon breach of any provision in this paragraph 1.12, HC may exercise its rights under such assignment of lease. Protection 7. HC may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise, in an amount consistent with the Specified Percentage or Specific Daily Amount. Protection 8. HC shall have the right, without waiving any of its rights and remedies and without notice to Merchant and/ or Guarantor(s), to notify Merchant's credit card processor of the sale of Receipts hereunder and to direct such credit card processor to make payment to HC of all or any portion of the amounts received by such credit card processor on behalf of Merchant. Merchant hereby grants to HC an irrevocable power-of-attorney, which power-of-attorney shall be coupled with an interest, and hereby appoints HC or any of HC's representatives as Merchant's attorney-in-fact, to take any and all action necessary to direct such new or additional credit card processor to make payment to HC as contemplated by this Section.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner, in respect of himself or herself personally, authorizes HC to disclose information concerning Merchant's and each Owner's and/ or Guarantor(s)'s credit standing and business conduct only, to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant, Guarantor(s) and Owner(s) hereby waives to the maximum extent permitted by law any claim for damages against HC or any of its affiliates relating to any (i) investigation undertaken by or on behalf of HC as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by HC, including this Agreement and any other HC documentations [collectively, "Confidential Information"] are proprietary and confidential information of HC. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of HC to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ["Advisor"], provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 1.13.

Case 2:19-bk-14989-WB Doc 605-7 Filed 02/19/20 Entered 02/19/20 16:80:41 Desc
Main Document Page 99 of 239

transaction between HC and Merchant, including the statements and other notices or filings.

**II. REPRESENTATIONS, WARRANTIES AND COVENANTS**

Merchant represents, warrants and covenants that as of this date and during the term of this Agreement:

2.1 Financial Condition and Financial Information. Its bank and financial statements, copies of which have been furnished to HC, and future statements which will be furnished hereafter at the discretion of HC, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise HC of any material adverse change in its financial condition, operation or ownership. HC may request statements at any time during the performance of this Agreement and the Merchant shall provide them to HC within 5 business days. Merchant's failure to do so is a material breach of this Agreement.

2.2 Governmental Approvals. Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

2.3 Authorization. Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4 Insurance. Merchant will maintain business-interruption insurance naming HC as loss payee and additional insured in amounts and against risks as are satisfactory to HC and shall provide HC proof of such insurance upon request.

2.5 Electronic Check Processing Agreement. Merchant will not change its processor, add terminals, change its financial institution or bank account(s) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without HC's prior written consent. Any such change shall be a material breach of this Agreement.

2.6 Change of Name or Location. Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and HC or change any of its places of business.

2.7 Estoppel Certificate. Merchant will at any time, and from time to time, upon at least one (1) day's prior notice from HC to Merchant, execute, acknowledge and deliver to HC and/or to any other person, person firm or corporation specified by HC, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

2.8 No Bankruptcy. As of the date of this Agreement, Merchant does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. In the event that the Merchant files for bankruptcy protection or is placed under an involuntary filing, Protections 2 and 3 are immediately invoked.

2.9 Working Capital Funding. Merchant shall further encumber the Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales, with any party other than HC.

2.10 Unencumbered Receipts. Merchant has good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of HC.

2.11 Business Purpose. Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.12 Default Under Other Contracts. Merchant's execution of and/or performance under this Agreement will not cause or create an event of default by Merchant under any contract with another person or entity.

**III. EVENTS OF DEFAULT AND REMEDIES**

3.1 Events of Default. The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) Merchant shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Merchant seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (d) the sending of notice of termination by Guarantor(s); (e) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (f) Merchant shall transfer or sell all or substantially all of its assets; (h) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (i) Merchant shall use multiple depository accounts without the prior written consent of HC; (j) Merchant shall change its depositing account without the prior written consent of HC; (k) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; (l) Merchant shall default under any of the terms, covenants and conditions of any other agreement with HC; or (m) Merchant shall fail to deposit its Receipts into the Account.

or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy. All rights, powers and remedies of HC in connection with this Agreement may be exercised at any time by HC after the occurrence of an Event of Default, are

cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.3 Costs. Merchant shall pay to HC all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and (b) the enforcement of HC's remedies set forth in Section 4.2 above, including but not limited to court costs and attorneys' fees.

3.4 Required Notifications. Merchant is required to give HC written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give HC seven (7) days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

**IV. MISCELLANEOUS**

4.1 Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

4.2 Assignment. HC may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

4.3 Notices. All notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective only upon receipt.

4.4 Waiver Remedies. No failure on the part of HC to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.5 Binding Effect; Governing Law, Venue and Jurisdiction. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of HC which consent may be withheld in HC's sole discretion. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if HC so elects, be instituted in any court sitting in New York State, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to jurisdiction or venue. Should a proceeding be initiated in any other forum, the parties waive any right to oppose any motion or application made by either party to transfer such proceeding to an Acceptable Forum.

4.6 Survival of Representation, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all of obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.7 Severability. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

4.8 Entire Agreement. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and Security Agreement hereto embody the entire agreement between Merchant and HC and supersede all prior agreements and understandings relating to the subject matter hereof.

4.9 JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

4.10 CLASS ACTION WAIVER. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.11 Facsimile Acceptance. Facsimile signatures shall be deemed acceptable for all purposes.

 INITIALS: 

Merchant's Legal Name: SCOOBEEZ, INC./ ABT MINING CO. INC

D/B/A: SCOOBEEZ/ABOT MINING CO.

Physical Address: 3965 PASADENA AVENUE

City: PASADENA     State: CA     Zip: 91105

Federal ID#: ▪▪▪▪▪▪▪▪

## SECURITY AGREEMENT

Security Interest. To secure Merchant's payment and performance obligations to HC under the Merchant Agreement (the "Factoring Agreement"), Merchant hereby grants to HC a security interest in (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, Chattel paper, documents, equipment, general intangibles, instruments, and inventory, as these terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC ("a" and "b" collectively, the "Collateral").

Cross-Collateral. To secure Guarantor's payment and performance obligations to HC under this Security Agreement and Guaranty (the "Agreement"), Guarantor hereby grants HC an additional security interest in ABOT MINING CO., INC AND ABOT MINING CO

_____

_____

_____

(the "Additional Collateral). Guarantor understands that HC will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Merchant and Guarantor each acknowledge and agree that any security interest granted to HC under any other agreement between Merchant or Guarantor and HC (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as HC deems necessary to perfect or maintain HC's first priority security interest in the Collateral, the Additional Collateral and the Cross-Collateral, including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes HC to file any financing statements deemed necessary by HC to perfect or maintain HC's security interest, which financing statement may contain notification that Merchant and Guarantor have granted a negative pledge to HC with respect to the Collateral, the Additional Collateral and the Cross-Collateral, and that any subsequent lienor may be interfering with HC's rights. Merchant and Guarantor shall be liable for and HC may charge and collect all costs and expenses, including but not limited to attorney's fees, which may be incurred by HC in protecting, preserving and enforcing HC's security interest and rights. Merchant further acknowledges that HC may use another legal name and/ or D/B/A when designating the Secured Party, when HC files the above referenced financing statement(s).

Negative Pledge. Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral, the Additional Collateral or the Cross-Collateral, as applicable

Consent to Enter Premises and Assign Lease. HC shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, HC may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that HC may enter into an agreement with Merchant's landlord giving HC the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment thereon for the purpose of protecting and preserving same; and (b) to assign Merchant's lease to another qualified Merchant capable of operating a business comparable to Merchant's at such premises.

Remedies. Upon any Event of Default, HC may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration or otherwise.

## GUARANTY

Personal Guaranty of Performance. The undersigned Guarantor(s) hereby guarantees to HC, Merchant's performance of all of the representations, warranties, covenants made by Merchant in this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due (i) at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in this Agreement and the Merchant Agreement, and (ii) at the time Merchant admits its inability to pay its debts, or makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Merchant seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts.

Guarantor Waivers. In the event that Merchant fails to make a payment or perform any obligation when due under the Merchant Agreement, HC may enforce its rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral, Additional Collateral or Cross-Collateral HC may hold pursuant to this Agreement or any other guaranty.

HC does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) HC's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to HC. In addition, HC may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement : (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to HC; (ii) release Merchant from its obligations to HC; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to HC under the Merchant Agreement and the Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under the Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under the Agreement: (i) subrogation ; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that HC must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

Guarantor Acknowledgement. Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/ She has consulted with counsel of its choice or has decided not to avail himself/ herself of that opportunity.

Joint and Several Liability. The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT" INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

HOP CAPITAL

## SECURITY AGREEMENT AND GUARANTY

MERCHANT #1 (Print Name)

By: First Name SHAHAN _____ Last Name OHANESSIAN _____

Title: PRESIDENT _____

SSN#: _____

Driver's License Number: _____

MERCHANT #2 (Print Name)

By: First Name _____ Last Name _____

Title: _____

SSN#: _____

Driver's License Number: _____

OWNER/GUARANTOR #1 (Print Name)

By: First Name SHAHAN _____ Last Name OHANESSIAN _____

Title: PRESIDENT _____

SSN#: _____

Driver's License Number: _____

OWNER/GUARANTOR #2 (Print Name)

By: First Name _____ Last Name _____

Title: _____

SSN#: _____

Driver's License Number: _____

HOP CAPITAL

Dear Merchant,

Thank you for accepting this offer from Hop Capital. We look forward to being your funding partner for as long as you need.

Daily ACH Program:
Hop Capital will require viewing access to your bank account, each business day, in order to calculate the amount of your daily payment. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it. Hop Capital will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.
*Be sure to indicate capital or lower case letters.*

Name of Bank: _____

Bank Portal Website: _____

Username: _____

Password: _____

Security Question/Answer 1: _____

Security Question/Answer 2: _____

Security Question/Answer 3: _____

Any other information necessary to access your account: _____

_____

*Please note: In the event that we are unable to access your account, we will take a daily estimated payment. An additional $39 fee will be assessed for each day we don't have access.*

HOP CAPITAL

## APPENDIX A: THE FEE STRUCTURE:

**A. Origination Fee**
$295.00 -- to cover underwriting and related expenses.

**B. ACH Program Fee**
$395.00 or 12% of the funded amount -- The ACH program is labor intensive and is not an automated process, requiring us to charge this fee to cover related costs.

**C. NSF Fee (Standard)**
$35.00 (each) Up to TWO TIMES ONLY before a default is declared.

**D. Rejected ACH**
$100.00 -- If a merchant directs the bank to reject our debit ACH.

**E. Bank Change Fee**
$50.00 -- If a merchant requires a change of account to be debited requiring us to adjust our system.

**F. Blocked Account**
$2,500.00 -- If a merchant blocks HC's ACH debit of the Account, bounces more than 4 debits of the Account, or simultaneously uses multiple bank accounts or credit-card processors to process its receipts.

**G. Default Fee**
$2,500.00 -- If a merchant changes bank accounts or switches to another creditcard processor without HC's consent, or commits another default pursuant to the Agreement.

**H. Miscellaneous Service Fees**
Merchant shall pay certain fees for services related to the origination and maintenance of accounts. Each Merchant shall receive their funding electronically to their designated bank account and will be charged $30.00 for a Fed Wire or $0.00 for a bank ACH. The Current charge for the underwriting and origination of each Merchant Agreement is $295.00 paid from the funded amount. Merchant will be charged $25.00 for every additional change of their operating bank account once they are active with HC. Additional copies of prior monthly statements will incur a fee of $10.00 each.

**I. Risk Assessment Fee**
$249.00

**J. UCC Fee**
$195.00

MERCHANT #1 (Print Name)

By: First Name SHAHAN          Last Name OHANESSIAN

Title: PRESIDENT

MERCHANT #2 (Print Name)

By: First Name _____ Last Name _____

Title: _____

HOP CAPITAL

## ADDENDUM TO SECURED MERCHANT AGREEMENT

This Addendum is entered on 09/13/2018 _____, by and between Hop Capital and    SCOOBEEZ, INC./ ABT MINING CO. INC
(the "Merchant").

1. Should any of the terms of this Addendum conflict with the terms of the agreement between Hop Capital and the Merchant
dated 09/13/2018 _____ (the "Agreement"), then the terms of this Addendum shall govern and be controlling. Capitalized terms used
herein but otherwise not defined, shall have the same definition as in the Agreement:

a. By signing below, the Merchant hereby requests and acknowledges that the Specified Percentage shall be revised to $ 8,199.00
per business day (the "Daily Payment") which the parties agree is a good-faith approximation of the Specified Percentage, based on the
Merchant's receipts due to Hop Capital pursuant the Agreement.

b. The Daily Payment is to be drawn via ACH payment, from the following bank account:

      i. Bank Account: _____

      ii. Routing Number: _____

      iii. Account Name: SCOOBEEZ, INC./ ABT MINING CO. INC _____

      iv. Bank Name: _____

c. At the Merchant's option, within five (5) business following the end of a calendar month, the Merchant may request a reconciliation
to take place, whereby Hop Capital may ensure that the cumulative amount remitted for the subject month via the Daily Payment is
equal to the amount of the Specified Percentage. However, in order to effectuate this reconciliation, upon submitting the request for
reconciliation to Hop Capital – but in no event later than five (5) business days following the end of the calendar month – the Merchant
must produce any and all evidence and documentation requested by Hop Capital in its sole and absolute discretion, necessary to
identify the appropriate amount of the Specified Percentage. The foregoing includes without limitation, any and all bank statements,
merchant statements or other documents necessary to ascertain the amounts of the Specified Percentage, including login to the
Merchant's bank account(s).

d. The Merchant specifically acknowledges that: (i) the Daily Payment and the potential reconciliation discussed above are being
provided to the Merchant as a courtesy, and that Hop Capital is under no obligation to provide same, and (ii) if the Merchant fails to
furnish the requested documentation within five (5) business days following the end of a calendar month, then Hop Capital shall not
effectuate the reconciliation discussed above.

IN WITNESS WHEREOF, the parties have executed this Addendum to the Agreement as of the date first set forth above.

MERCHANT #1 (Print Name)

By:  First Name SHAHAN _____     Last Name OHANESSIAN _____

Title: PRESIDENT _____

MERCHANT #2 (Print Name)

By:  First Name _____     Last Name _____

Title: _____

HOP CAPITAL

By: _____

This authorization is to remain in full force and effect until Hop Capital receives written notification from the Merchant of
its termination in such time and in such manner to afford Hop Capital a reasonable opportunity to act on it. Revocation of
this authorization prior to remittance of the balance owed pursuant to the Agreement is prohibited.



FedEx

THU – 21 MAR 10:30A
PRIORITY OVERNIGHT

TRK# 7747 4476 7476
0201

12207
NY-US
ALB

EI ALBA

ORIGIN ID:FOUA    (646) 389-5610
JASON GANG
LAW OFFICE OF JASON GANG
#478
HEWLETT, NY 11557
UNITED STATES US

SHIP DATE: 19MAR19
ACTWGT: 1.00 LB

BILL SENDER

TO CO CORPORATION SERVICE COMPANY
AMAZON.COM SERVICES, INC
80 STATE STREET
6TH FLOOR
ALBANY NY 12207
(800) 935-5961

REF:
PO:    DEPT:



FID 6173272 20MAR19 HTDA  663C1/46D3/8CBA

Align bottom of peel-and-stick airbill or pouch here.